<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | |
| **v.** | **Criminal Action No. 13-592 (ES)** |
| | **OPINION** |
| **JOSEPH A. FERRIERO** | |
| **Defendant.** | |

**SALAS, DISTRICT JUDGE**

**I.    Introduction**

In a five-count indictment, Defendant Joseph A. Ferriero was charged with violating N.J.S.A. 2C:27-2(a) (the "New Jersey Bribery Statute"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), the Travel Act, 18 U.S.C. § 1952, and the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343.  Ferriero moves to dismiss Count One on the ground that the Indictment fails to allege a chargeable offense under the Racketeer Influenced and Corrupt Organizations Act.  Ferriero also moves to dismiss Counts One, Two, and Three on the grounds that: (1) the New Jersey Bribery Statute is unconstitutionally overbroad, both facially and as applied to him, and (2) the New Jersey Bribery Statute is unconstitutionally vague as applied to him.  For the reasons discussed below, the Court concludes that Ferriero's challenges lack merit.  Therefore, the Court denies Ferriero's motion to dismiss Counts One, Two, and Three of the Indictment.

## II.    Factual Background[1]

On September 11, 2013, a federal grand jury sitting in Newark, New Jersey returned a five-count indictment against Ferriero (the "Indictment").  (D.E. No. 1, Indictment ("Ind.") at 1).  Count One of the Indictment alleges that Ferriero violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), by conducting the affairs of a political organization through a pattern of racketeering activity, including violating the New Jersey Bribery Statute.  (Ind., Count One ¶ 77).  Count Two alleges that Ferriero engaged in a conspiracy to violate the Travel Act and to commit mail and wire fraud.  (*Id.*, Count Two ¶¶ 2(a)-(b)).  Count Three alleges that Ferriero violated the Travel Act.  (*Id.*, Count Three ¶ 2).  Finally, Counts Four and Five respectively allege that Ferriero committed mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343.  (*Id.*, Counts Four-Five ¶ 4).

Ferriero was an attorney licensed to practice law in the state of New Jersey during the time frame alleged in the Indictment—December 2001 to October 2008.  (*Id.*, Count One ¶ 1A).  In 1998, Ferriero was elected Chairman of the Bergen County Democratic Organization (the "BCDO").  (*Id.*).  The position was unpaid, and Ferriero continued to practice law as a partner in various New Jersey law firms.  (*Id.*; D.E. No. 10, Brief in Support of Joseph Ferriero's Pretrial Motions ("Def. Mov. Br.") at 1).  He was re-elected to this position every two years until he resigned in January 2009.  (Ind., Count One ¶ 1A).  Ferriero maintains that, during all times relevant to the Indictment, he was a consultant, businessman, lawyer, and volunteer political official.  (Def. Mov. Br. at 1).

---

[1] The following facts are gathered from the Indictment unless otherwise stated.  For purposes of deciding this motion, the Court accepts the factual allegations contained in the Indictment as true.  *See United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011) (quoting *United States v. Besmajian*, 910 F.2d 1153, 1554 (3d Cir. 1990)).

The BCDO is a county committee of the Democratic political party.[2]  (Ind., Count One ¶ 1B).  Its responsibilities include selecting candidates for federal, state, and local election ballots, coordinating fundraising and political campaigns, and determining the Democratic party's position on various issues.  (*Id.*).  As Chairman of the BCDO, Ferriero "provided opinions and recommendations to BCDO members and was in a position to influence, and did influence, the actions of BCDO members."  (*Id.*).

From December 2001 to October 2008, Ferriero engaged in illegal activity through three schemes: (1) the Governmental Grants Consulting, LLC ("GGC") Kickback Scheme; (2) the Retail & Entertainment Project Bribery and Extortion Scheme; and (3) the SJC Consulting, LLC ("SJC") Bribery Scheme.  (*Id.* at 8, 22, 37).

## A.      The GGC Kickback Scheme

In December 2001, Ferriero decided to create GGC to capitalize on his access to and influence with democratic officials.  (*Id.* ¶ 7).  GGC assisted municipalities with obtaining grants and funding in exchange for a percentage of the awards.  (*Id.*).  Ferriero kept his ownership of the company concealed.  (*Id.*).  Around the same time that he developed the idea of GGC, Ferriero used his influence and authority as Chairman of the BCDO to have Dennis J. Oury appointed as Borough Attorney for the Borough of Bergenfield, New Jersey.  (*Id.* ¶ 6).  Once Oury was appointed as Borough Attorney, Ferriero gave Oury a concealed ownership interest in GGC, which entitled Oury to receive a share of GGC's profits.  (*Id.* ¶ 8).  Ferriero also offered a similar ownership interest in GGC to a Republican mayor in Bergen County.  (*Id.* ¶ 9).

---

[2] The BCDO is now known as the Bergen County Democratic Committee. (D.E. No. 29, Transcript of Proceedings ("Hr'g Tr.") 37:16-18).

Based on Oury's advice, the Bergenfield Mayor and Council appointed GGC as the Borough's municipal grantsman.[3]  (*Id.* ¶ 14).  Oury did not disclose his financial interest in GGC. (*Id.*).  To maintain their concealed ownership in the company, and for the purposes of signing official documents, Ferriero, Oury, and the Bergen County mayor had an individual with a grant writing business in Bergen County sign official documents as GCC's President.  (*Id.* ¶ 17).  They also had Ferriero's secretary sign official documents as GGC's corporate secretary.  (*Id.*).

In accordance with a monthly retainer agreement, Bergenfield paid GGC a total of $6,000 for the year of 2002.  (*Id.* ¶¶ 18, 22).  Furthermore, based on GGC's successful grant writing services, Bergenfield paid GGC a fee of $128,625.  (*Id.* ¶ 28).  The check for $128,625 was deposited into GGC's bank account and dispersed between Ferriero, Oury, and the other individuals involved in the GGC scheme. (*Id.* ¶¶ 30-31).

### B.    The Retail & Entertainment Project Bribery and Extortion Scheme

With respect to the Retail & Entertainment Project Bribery and Extortion Scheme, the Indictment alleges that Ferriero committed racketeering acts involving a development project at the New Jersey Meadowlands.  The New Jersey Sports & Exposition Authority (the "NJSEA") was seeking redevelopment proposals for its Meadowlands site (the "NJSEA site").  (*Id.* ¶ 42).  A Virginia-based Real Estate Investment Trust (the "Virginia REIT") had an interest in redeveloping the NJSEA site.  (*Id.* ¶ 35).  Knowing that public support would be an important factor, the Virginia REIT contacted Ferriero for his assistance as BCDO Chairman to garner public support from BCDO members, as well as to prevent him from opposing the project with those over whom he had influence.  (*Id.* ¶¶ 34, 36).

---

[3] Oury also took other action on GGC's behalf at the insistence of Ferriero, such as making sure the contract between Bergenfield and GGC was signed so that Bergenfield could pay GGC its monthly retainer fee. (Ind., Count One ¶ 21).

At a meeting, Ferriero told an attorney acting on behalf of the Virginia REIT that Ferriero's law firm had been asked to represent one of the Virginia REIT's competitors and that the competitor intended to use "scorched earth" tactics to defeat the Virginia REIT's proposal for the NJSEA site.  (*Id.* ¶ 43).  However, Ferriero stated that he would work with the Virginia REIT, rather than the competitor, for a monthly fee of $35,000.  (*Id.*).  The Virginia REIT agreed to pay this fee in exchange for: (1) Ferriero's agreement not to publicly oppose, or cause other members of the BCDO to oppose, its proposal for the NJSEA site, and (2) Ferriero's assistance in obtaining endorsements, public support, and other official action regarding the proposal.  (*Id.* ¶ 44).

In furtherance of this agreement, Ferriero used BCDO consultants to prepare talking points and draft press releases that benefited the Virginia REIT's proposal ideas.  (*Id.* ¶ 47).  Additionally, in his capacity as Chairman, Ferriero caused Bergen County officials to hold a press conference to discuss which NJSEA proposal ideas they would support—ideas that Ferriero had already conceived and discussed with the Virginia REIT prior to the press conference.  (*Id.* ¶ 48).  Ferriero also exercised his influence over a New Jersey State Senator who had introduced legislation that would hinder the Virginia REIT's proposal.  (*Id.* ¶ 61).  After speaking with Ferriero, the Senator withdrew the legislation.  (*Id.*).  The Virginia REIT was ultimately selected to develop the NJSEA site.  (*Id.* ¶ 62).

From September 2002 until September 2006, the Virginia REIT paid a $35,000 monthly fee to Ferriero's company, Concept Realization, LLC.[4]  (*Id.* ¶¶ 50-55).  However, these payments were routed through a New Jersey law firm.  Essentially, the Virginia REIT would pay a New Jersey law firm the $35,000 monthly fee, and the law firm would then forward the fee to Concept

---

[4] Concept Realization, LLC was never registered as a governmental affairs agent with the New Jersey Election Law Enforcement Commission, which is "required of any individual or entity that lobbies state officials . . . in exchange for pay."  (Ind., Count One ¶ 41).

Realization.  (*Id.* ¶ 55).  During this time period, the Virginia REIT paid Ferriero approximately $1.7 million.  (*Id.*).

### C.    The SJC Bribery Scheme

The SJC Bribery Scheme involves five individual racketeering acts.  According to the Indictment, in 2007, a software developer sought to obtain contracts between his companies, Xquizit and C3, and various New Jersey municipalities.  (*Id.* ¶ 68).  In August 2007, Ferriero and the software developer agreed that Ferriero would recommend and provide a favorable opinion of the developer, Xquizit, C3, and the services provided by Xquizit and C3 to government officials in Bergen County over whom Ferriero had influence.  (*Id.*).  In exchange for Ferriero's exercise of influence, the software developer paid Ferriero kickbacks, which corresponded to a percentage of the fees that the software developer received through contracts with the municipalities.  (*Id.*).

In connection with this plan, Ferriero and the software developer incorporated SJC Consulting, LLC in Las Vegas, Nevada.  (*Id.* ¶ 70).  From August 2007 to July 2008, Ferriero used his official position as BCDO Chairman to recommend the software developer, the developer's companies Xquizit and C3, and the services provided by Xquizit and C3 to BCDO members.  (*Id.* ¶ 73).  Ferriero provided these recommendations to five municipalities without disclosing his personal financial interest.  (*Id.* ¶¶ 73A-G).  Four municipalities ultimately retained C3.  (*Id.* ¶¶ 73B-C, 73E-F).

On at least one occasion, Ferriero recommended the software developer to a municipality at a BCDO-sponsored annual gathering of public officials.  (*Id.* ¶ 73E).  Furthermore, when one municipality failed to retain the software developer's services, Ferriero confronted the municipality's official at a BCDO-sponsored event and "angrily demanded" to know why it had not the retained the software developer.  (*Id.* ¶ 73D).  Ferriero received a twenty-five percent

kickback for the contracts that the software developer obtained from the four municipalities.  (*Id.* ¶ 75).

## III.    Procedural History

On June 30, 2014, Ferriero filed several pretrial motions.  (D.E. No. 10).  In particular, Ferriero sought: (1) to dismiss Counts One, Two, and Three of the Indictment because the New Jersey Bribery Statute is vague; (2) to dismiss Counts One, Two, and Three of the Indictment because the New Jersey Bribery Statute is overbroad; (3) to dismiss Count One of the Indictment because it fails to allege a RICO offense; (4) to dismiss the Indictment because the government abused the grand jury process; (5) for the Court to produce grand jury transcripts; (6) for the government to disclose *Brady* impeachment material; and (7) for the government to provide a bill of particulars.  (*See* Def. Mov. Br.).

After briefing on the pretrial motions was complete, Ferriero's counsel requested an opportunity to supplement his arguments regarding the constitutionality of the New Jersey Bribery Statute.  During a telephone conference to discuss Ferriero's request, the Court granted Ferriero the opportunity to file a supplemental brief addressing his challenges to the New Jersey Bribery Statute.  (D.E. No. 19).  The Court also granted the government the opportunity to file a response. (*Id.*).

On October 16, 2014, the Court held oral argument on Ferriero's pretrial motions.  During oral argument, the Court reserved its decision on Ferriero's motion to dismiss Count One of the Indictment for failure to allege a RICO offense, as well as its decision on Ferriero's constitutional challenges.  (D.E. No. 24).  The Court denied Ferriero's remaining motions.[5]  (*Id.*).

---

[5] In particular, the Court denied Ferriero's motion for the Indictment to be dismissed because of grand jury abuse, for the production of grand jury transcripts, and for a bill of particulars.  The Court did not address Ferriero's motion for the production of *Brady* impeachment material, as Ferriero's counsel agreed to withdraw the motion without prejudice.  (Hr'g Tr. 4:1-2).

The Court will address Ferriero's last three motions in turn.

## IV.   Ferriero's Motion to Dismiss Count One of the Indictment for Failure to Allege a RICO Offense

Ferriero contends that Count One of the Indictment should be dismissed for failure to allege a RICO offense.  (Def. Mov. Br. at 28).  The Court will first address the rules governing a district court's review of a motion to dismiss an indictment.  Following this discussion, the Court will address the merits of Ferriero's argument.

### A.   Legal Standard for Dismissing an Indictment

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  The Federal Rules "were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure."  *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (quoting *United States v. Debrow*, 346 U.S. 374, 376 (1953)) (internal citations omitted).  Although detailed allegations may have been required under common law, they are not contemplated by Rule 7(c)(1).  *Id.*

In order to comply with Rule 7(c)(1), indictments must be sufficient on their face.  *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007).  An indictment is sufficient if it: (1) contains the elements of the offense intended to be charged; (2) sufficiently apprises the defendant of what he must be prepared to meet; and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.[6]  *Id.*  Moreover, an indictment does not require greater specificity than the statutory language of the offense charged if there is a sufficient factual framework to allow the defendant to prepare his or

---

[6] Ferriero and the government only dispute the first element of the inquiry—whether the Indictment contains the elements of the RICO offense charged.

8

her defense. *Bergrin*, 650 F.3d at 264. Nevertheless, a district court must find that "a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002), *abrogated on other grounds by United States v. Wright*, 665 F.3d 560 (3d Cir. 2012).

A district court's review is limited, however. A court must accept all the factual allegations in the indictment as true. *Bergrin*, 650 F.3d at 265 (quoting *Besmajian*, 910 F.2d at 1554). A motion to dismiss is "not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000). Likewise, "a challenge to the sufficiency of the indictment should be decided based on the facts alleged within the four corners of the indictment, not the evidence outside of it." *Vitillo*, 490 F.3d at 321.

Having reviewed the applicable legal standard for a motion to dismiss an indictment, the Court will now address what an indictment must allege to sufficiently state a RICO violation under 18 U.S.C. § 1962(c).

### B.    RICO Requirements

Count One of the Indictment alleges that Ferriero committed racketeering acts in violation of 18 U.S.C. § 1962(c). Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

Ferriero contends that the government has not properly alleged a RICO violation under 18 U.S.C. § 1962(c) because the government has failed to establish that Ferriero "participated in the conduct of the affairs of the enterprise through a pattern of racketeering." (Def. Mov. Br. at 28);

*see* 18 U.S.C. § 1962(c).  Essentially, Ferriero argues that the government has not properly established what some courts have deemed to be the RICO nexus requirement.  (Def. Mov. Br. at 31).

To establish a RICO violation under Section 1962(c), the government must prove: "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated . . . either directly or indirectly, in the conduct of the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity."  *Bergrin*, 650 F.3d at 265 (quoting *United States v. Irizarry*, 341 F.3d 273, 285 (3d Cir. 2003)) (internal quotation marks omitted).

Ferriero does not dispute that the Indictment sufficiently alleges the first two elements.[7] (*See* Def. Mov. Br. at 28).  However, he contends that the government has failed to properly establish the third and fourth elements of a RICO offense.  (*Id.*).

To establish the third element of a RICO offense—that the defendant participated in the conduct of the affairs of the enterprise—a defendant must "have some part in directing those affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  Essentially, "one is not liable under that provision unless one has participated in the operation or management of the enterprise itself." *Id.* at 183.  According to *Reves*, the operation and management test is satisfied by an individual who "exerts control over" the enterprise's affairs.  *Id.* at 184.

Moreover, to establish the fourth element of a RICO offense—that the defendant participated through a pattern of racketeering activity—the government must sufficiently establish a nexus between the conduct of the affairs of the enterprise and the pattern of racketeering activity.

---

[7] The Indictment alleges that for the purposes of Count One, the BCDO is an enterprise as defined by 18 U.S.C. § 1961(4), and that the BCDO was engaged in and affected interstate commerce.  (Ind., Count One ¶ 2).  Furthermore, the Indictment alleges that Ferriero was the Chairman of the BCDO.  (*Id.* ¶ 1B).

*In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 372 (3d Cir. 2010) [hereinafter *Insurance Brokerage*].  In order to establish this nexus, the defendant must have participated in the conduct of the enterprise's affairs "through—that is, by means of, by consequence of, by reason of, by agency of, or by the instrumentality of—a pattern of racketeering activity." *Id.* (internal quotation marks and citation omitted).

Thus, the proper inquiry as to whether the government sufficiently established the third and fourth elements of a RICO offense must be whether the defendant participated in the operation or management of an enterprise's affairs, and if so, whether he did so "by means of, by consequence of, by reason of, by agency of, or by the instrumentality of" a pattern of racketeering activity.  *See id.*  Accordingly, in order to survive Ferriero's motion to dismiss Count One of the Indictment, the government must allege that Ferriero participated in the operation or management of the BCDO (i.e., the enterprise) "by means of, by consequence of, by reason of, by agency of, or by the instrumentality of" a pattern of racketeering activity.  *See Reves*, 507 U.S. at 179; *see also Insurance Brokerage*, 618 F.3d at 372.

### C.    Analysis of Ferriero's Motion to Dismiss Count One of the Indictment

Turning to the instant Indictment, Ferriero asserts that the government did not allege that he participated in the conduct of the affairs of the BCDO through a pattern of racketeering, thus failing to establish the third and fourth elements of a RICO offense.  (Def. Mov. Br. at 28).  According to Ferriero, the Indictment is devoid of any indication that the racketeering acts relate to the affairs of the BCDO.  (*Id.* at 32).  Ferriero bases his argument on the premise that the Indictment does not contain any allegations that payments were issued by the BCDO, that any money was paid to the BCDO, that money flowed through BCDO bank accounts, or that Ferriero utilized the BCDO's premises, letterhead, phone lines, or email systems.  (*Id.*).

11

In response, the government argues that the Indictment alleges, in a wealth of detail, how Ferriero conducted the affairs of the BCDO "through" a pattern of racketeering activity.  (D.E. No. 11, Memorandum of the U.S. in Response to Defendant's Pretrial Motions ("Gov't Opp. Br.") at 34).  First, the government contends that Ferriero's use of power and authority as BCDO Chairman is sufficient to establish a nexus.  (*Id.* at 38).  Second, the government disputes Ferriero's argument that the Indictment does not contain any allegations that the BCDO's resources were used.  The government stated that "though it would be sufficient, the Indictment . . . does not rely solely on the use by defendant of the power and authority of his office."  (*Id.*).  In particular, the government argues that there were both tangible and intangible ways in which Ferriero used the BCDO and its operations during the course of the alleged racketeering activity.  (*Id.*).  Based on the foregoing, the government contends that there is no basis for Ferriero's motion to dismiss.  (*Id.* at 40).  Upon close review of the Indictment, the Court agrees.

First, the Indictment sufficiently alleges that Ferriero participated in the operation or management of the BCDO, thus satisfying the third element of a RICO offense.  According to the Indictment, the BCDO's responsibilities were to select candidates to appear on ballots for the Democratic party, to coordinate fundraising and political campaigns, and to determine the party's positions on various issues.  (Ind., Count One ¶ 1B).  Furthermore, the Indictment states that as Chairman of the BCDO, Ferriero "provided opinions and recommendations to BCDO members and was in a position to influence, and did influence, the actions of BCDO members."  (*Id.*).  Therefore, according to the Indictment, one of the ways in which Ferriero operated the BCDO was by providing recommendations and influencing the actions of BCDO members.  The Indictment alleges numerous instances in which Ferriero operated the BCDO by providing recommendations and exerting his influence.  For example, the Indictment alleges that Ferriero exercised his

influence to have Oury appointed as Borough Attorney, (*id.* ¶ 6), that he provided his assistance as Chairman to obtain endorsements for the Virginia REIT, (*id.* ¶ 34), and that he recommended the software developer to local government officials in Bergen County over whom Ferriero had influence, (*id.* ¶ 68).  Furthermore, the Indictment also contains allegations that Ferriero exerted his control over the BCDO.  For example, the Indictment states that Ferriero directed a BCDO consultant to draft talking points and a press release in furtherance of the Retail & Entertainment Project Bribery and Extortion Scheme.  (*Id.* ¶ 47)  Given these allegations, the Indictment sufficiently alleges that Ferriero participated in the operation or management of the BCDO.

Second, the Indictment sufficiently alleges that Ferriero participated in the affairs of the BCDO "through" a pattern of racketeering activity, thus satisfying the fourth element of a RICO offense.  Ferriero's argument that the Indictment does not allege that the BCDO's physical resources were used rests on an erroneous premise because the Indictment does contain allegations to that effect.  According to the Indictment, Ferriero caused a BCDO consultant and spokesperson to draft talking points and press releases regarding proposal ideas for the NJSEA site that would ultimately benefit the Virginia REIT's chances of securing the redevelopment project.  (*Id*. ¶ 47).  Furthermore, the Indictment alleges that as BCDO Chairman, Ferriero caused a Bergen County Executive and two other officials running for office to hold a press conference discussing the NJSEA project in a manner that benefited the Virginia REIT.  (*Id.* ¶ 48).  Moreover, the Indictment alleges that Ferriero made and discussed recommendations at BCDO-sponsored events.  (*Id.* ¶¶ 73D-E).

In addition to the allegations that BCDO resources were used, the Indictment also alleges that Ferriero used his power and influence as Chairman to engage in illegal activity.  (*Id.* ¶¶ 1B, 3, 5, 6, 34, 44, 68, 73, 75).  Numerous courts have recognized the use of power and authority to be a

sufficient nexus under RICO both as an independent factor and in conjunction with more tangible allegations.  The First Circuit in *United States v. Marino* noted that a defendant's use of his or her position in the enterprise to commit the racketeering acts independently suffices to establish the nexus requirement.  277 F.3d 11, 27-28 (1st Cir. 2002) (citing *United States v. Ruiz*, 905 F.2d 499, 504 (1st Cir. 1990) (holding that a sufficient relationship between the predicate acts and the enterprise existed where defendant's ability to commit the crimes was "inextricably intertwined with his authority and activities as an employee of [the police department]")).  Similarly, in *United States v. Grubb*, the Fourth Circuit held that there was a sufficient nexus between the enterprise and the racketeering activity where a state judge used his judicial office—the telephones and the physical office—in addition to the "prestige and power of the office itself."  11 F.3d 426, 439 (4th Cir. 1993).  Moreover, the Fourth Circuit emphasized that "an additional reason supporting the fact that the affairs of the enterprise were conducted through a pattern of racketeering activities, is the fact that the record shows beyond a doubt that the power and prestige of Grubb's office placed him in a position to perform the discrete, corrupt and fraudulent acts."  *Id.* at 439-40.

Here, as a preliminary matter, the Indictment contains allegations that are specifically modeled after language contained in § 1962(c).  For example, the Indictment alleges that Ferriero "conducted and participated . . . in the conduct of the affairs of the BCDO Enterprise through a pattern of racketeering activity."  (Ind., Count One ¶ 4).  In addition to the statutory language, the Indictment also contains factual allegations that support this language.  Under Third Circuit case law, if the indictment contains a sufficient factual framework, courts should not require any greater specificity than the statutory language.  *See Bergrin*, 650 F.3d at 264.

According to the Indictment, "Ferriero's objectives in conducting and participating in the affairs of the BCDO Enterprise was to secretly profit from his position as BCDO Chairman by

. . . accepting concealed bribes and kickbacks . . . for . . . his own opinions, recommendations, and exercises of discretion."  (Ind., Count One ¶ 3).  Furthermore, Ferriero allegedly "used his influence and authority as Chairmen of the BCDO to cause and attempt to cause DENNIS J. OURY to be appointed as Borough Attorney."  (*Id.* ¶ 6).  Additionally, the Indictment alleges Ferriero accepted a stream of payments "in exchange for defendant FERRIERO's assistance, as BCDO Chairman, in obtaining endorsements and other official action from public officials who were BCDO members."  (*Id.* ¶ 34).  Moreover, the Indictment alleges that "in exchange for payments made pursuant to his agreement with the Software Developer, defendant Ferriero used his official position as BCDO Chairman and influence as a high-ranking party official . . . to provide a favorable opinion of, and recommend, the Software Developer . . . ." (*Id.* ¶ 73).  As stated previously, the Indictment also alleges that Ferriero utilized a BCDO consultant in furtherance of the schemes.  (*Id.* ¶ 47).  What stands out for the Court, however, are the numerous instances in which the Indictment alleges that Ferriero used his influence and authority, or took official action, as Chairman of the BCDO.  (*Id.* ¶¶ 6, 34, 38, 44, 47, 48, 49, 51, 63, 73, 75).

Essentially, the government alleges that Ferriero operated the BCDO through a pattern of racketeering activity by bribing, extorting, and receiving a benefit to do what he was elected to do—provide opinions and influence BCDO members.  (*Id.* ¶ 3).  The predicate racketeering acts of bribery and extortion were the means by which Ferriero operated the BCDO because he exchanged his actions taken as Chairman for money in an allegedly illegal fashion.  (*Id.*).  Although the Third Circuit has not directly addressed this issue of whether influence and power is enough to satisfy the nexus requirement, the Court finds that the Indictment includes allegations that Ferriero used both his influence and BCDO resources.  The issue of whether the government can sustain these allegations during trial requires a higher burden that is not contemplated by the Court

at this stage.  However, the Court does find that the government has sufficiently alleged a nexus to overcome Ferriero's motion to dismiss the RICO charge.

## V.      Ferriero's Constitutional Challenges to the New Jersey Bribery Statute

Ferriero challenges the New Jersey Bribery Statute as unconstitutionally overbroad in violation of the First Amendment and unconstitutionally vague in violation of the Fifth Amendment.[8]  The Court begins its analysis with Ferriero's overbreadth claims.

### A.       The Overbreadth Doctrine

"[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights."  *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999).  However, application of this doctrine is "strong medicine" to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).  Accordingly, "a law may be invalidated as overbroad only if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"  *Free Speech Coal., Inc. v. Att'y Gen.*, 677 F.3d 519, 537 (3d Cir. 2012) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).  The party bringing the overbreadth challenge "bears the burden of demonstrating, from the text of [the law] and from actual fact, that substantial overbreadth exists."  *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (alteration in original) (internal quotation marks omitted).

A court's first step in conducting an overbreadth analysis "is to construe the challenged statute," as "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."  *United States v. Williams*, 553 U.S. 285, 293 (2008).  Statutory

---

[8] In Ferriero's moving brief, he argued in a footnote that applying the New Jersey Bribery Statute to him would infringe "on his protected Fourteenth Amendment right to 'engage in any of the common occupations of life.'"  (Def. Mov. Br. at 27 n.3 (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972)).  He also asserted that the pursuit of a common occupation is a privilege protected by the Privileges and Immunities Clause.  (*Id.*).  During oral argument, however, Ferriero withdrew the challenges raised in this footnote.  (Hr'g Tr. 181:21-25).

interpretation requires courts to "rea[d] the whole statutory text, conside[r] the purpose and context of the statute, and consul[t] any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006); *see also Dada v. Mukasey*, 554 U.S. 1, 16 (2008) ("[W]e must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." (alteration in original) (quoting *United States v. Heirs of Boisdore*, 8 How. 113, 122 (1850))).

After construing the contested statute, a court's next step is to determine whether the statute "criminalizes a substantial amount of protected expressive activity." *Williams*, 553 U.S. at 297. The Third Circuit has enumerated the following factors to consider when making such a determination: "[1] the number of valid applications, [2] the historic or likely frequency of conceivably impermissible applications, [3] the nature of the activity or conduct sought to be regulated, and [4] the nature of the state interest underlying the regulation." *See Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 226 (3d Cir. 2004) (internal quotation marks omitted). In analyzing the four *Gibson* factors, a court first compares the number of valid applications of the statute to the likelihood and frequency of impermissible applications of the statute. *Id.* at 226-28. The court then evaluates the remaining two *Gibson* factors. *Id.*

Finally, before striking down a statute as facially overbroad, a court must ask whether the statute is "readily susceptible to a narrowing construction that would make it constitutional." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988) (internal quotation marks omitted); *see also Broadrick*, 413 U.S. at 613 ("Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute."). In particular, a court must "consider any limiting construction that a state court or enforcement agency has proffered." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982). In

17

the absence of a limiting construction, a court should "presume any narrowing construction or practice to which the law is fairly susceptible." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988) (internal quotation marks omitted).

### B.    Ferriero's Facial Overbreadth Challenge

With these principles in mind, the Court turns to Ferriero's facial overbreadth challenge. Ferriero argues that the New Jersey Bribery Statute is unconstitutionally overbroad because: (1) "there are far too many 'conceivably impermissible applications'" of the statute, since "every unpaid volunteer with a title who makes recommendations or gives an opinion on a public matter . . . is exposed to criminal prosecution if he also earns a living by making recommendations or giving opinions on such matters"; (2) the New Jersey Bribery Statute criminalizes political speech deserving of First Amendment protection; and (3) the government does not have a compelling interest "in regulating a party official in this manner."  (Def. Mov. Br. at 24-25).

The government, on the other hand, argues that Ferriero's facial overbreadth challenge fails because: (1) the New Jersey Bribery Statute and its predecessor have been validly applied in numerous cases; (2) the likelihood and frequency of conceivably impermissible applications of the statute is virtually zero; (3) the nature of the activity sought to be regulated is bribery, which falls outside the protections of the First Amendment; and (4) the New Jersey Bribery Statute serves a compelling state interest because it seeks to curb public corruption.  (Gov't Opp. Br. at 26-31).

#### 1.   *Interpretation of the New Jersey Bribery Statute*

As an initial matter, the Court must interpret the New Jersey Bribery Statute to determine what the statute prohibits.  *See Williams*, 553 U.S. at 293.  The pertinent provision of the New Jersey Bribery Statute provides as follows:

2C:27–2. Bribery in official and political matters

A person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

a. Any benefit as consideration for a decision, opinion, recommendation, vote or exercise of discretion of a public servant,[9] party official[10] or voter on any public issue or in any public election . . . .

N.J.S.A. 2C:27-2(a).

It is apparent from the plain language of the New Jersey Bribery Statute, and its title, that the statute proscribes bribery in official and political matters. The statute sets forth when "[a] person is guilty of bribery," and it specifies that the decisions, opinions, and recommendations, among other actions, must be on a *public* issue or in a *public* election. *Id.* Furthermore, the statute is entitled "Bribery in official and political matters." N.J.S.A. 2C:27-2.

As to the "benefit" that a person guilty of bribery gives or receives, the New Jersey Bribery Statute defines "benefit" as "gain or advantage, or anything regarded by the beneficiary as gain or advantage, including a pecuniary benefit or a benefit to any other person or entity in whose welfare he is interested." N.J.S.A. 2C:27-1(a). Additionally, the statute defines the phrase "benefit as consideration" as "any benefit not authorized by law." N.J.S.A. 2C:27-2. When "benefit as consideration" is replaced with the statutory definition of this phrase, the statute reads as follows: "A person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another: a. Any benefit [not authorized by law] for a decision, opinion, recommendation, vote or exercise of discretion . . . on any public

---

[9] A "public servant" is defined as "any officer or employee of government, including legislators and judges, and any person participating as juror, advisor, consultant or otherwise, in performing a governmental function, but the term does not include witnesses." N.J.S.A. 2C:27-1(g).

[10] A "party official" is defined as "a person who holds an elective or appointive post in a political party in the United States by virtue of which he directs or conducts, or participates in directing or conducting party affairs at any level of responsibility." N.J.S.A. 2C:27-1(e).

issue." N.J.S.A. 2C:27-2(a).  Based on the plain language of the statute, an official cannot give or receive a benefit as consideration for an exercise of official discretion unless that benefit is authorized by another law.  *See United States v. Bryant*, 556 F. Supp. 2d 378, 410 (D.N.J. 2008) (interpreting N.J.S.A. 2C:27-2(a) and explaining that "all 'benefits' fall within the statute's prohibition unless they are authorized elsewhere"), *aff'd*, 655 F.3d 232 (3d Cir. 2011).

The legislative purpose of the New Jersey Bribery Statute further informs the Court's analysis.  *See Dolan*, 546 U.S. at 486 (explaining that statutory interpretation "depends upon reading the whole statutory text, considering the purpose and context of the statute"); *see also State v. Schenkolewski*, 693 A.2d 1173, 1185 (N.J. Super. Ct. App. Div. 1997) ("While penal statutes must be strictly construed, such construction does not prevent the court from reading a statute in relation to the evil sought to be eradicated or from giving effect to the terms of the statute which will accord with their fair and natural meaning.").  Since there is a limited record regarding the New Jersey Bribery Statute's legislative history, the Court will consider the legislative history of its predecessor statute, N.J.S.A. 2A:93-6,[11] which closely resembles the current statute.  *See Schenkolewski*, 693 A.2d at 1185 (describing N.J.S.A. 2A:93-6 as "very similar to our current bribery statute. *N.J.S.A.* 2C:27–2").  As Ferriero concedes, "the legislative history of *N.J.S.A.* 2A:93-6 and its interpretation by New Jersey courts is equally applicable to the extant bribery statute, *N.J.S.A.* 2C:27-2."  (Def. Mov. Br. at 20 (citing *United States v. Manzo*, 851 F. Supp. 2d 797, 822 (D.N.J. 2012))).

---

[11] N.J.S.A. 2A:93-6 provides that "[a]ny person who directly or indirectly gives or receives, offers to give or receive, or promises to give or receive any money, real estate, service or thing of value as a bribe, present or reward to obtain, secure or procure any work, service, license, permission, approval or disapproval, or any other act or thing connected with or appertaining to any office or department of the government of the state or of any county, municipality or other political subdivision thereof, or of any public authority, is guilty of a misdemeanor."

The New Jersey Appellate Division has described the predecessor statute as "complet[ing] a legislative scheme which has become apparent over the years, I.e., to penalize those in an apparent position of trust who would utilize their position or relationship to influence some governmental activity of [a] public official."  *State v. Ferro*, 320 A.2d 177, 181 (N.J. Super. Ct. App. Div. 1974) (reviewing the legislative codification of New Jersey bribery statutes since 1898 and explaining the legislative purpose of the predecessor statute), *cert. denied*, 65 N.J. 566 (1974); *see also id*. at 180 (describing the conduct proscribed under the predecessor statute as "a common evil which denigrates the integrity of our public institutions").  This legislative history illustrates that, consistent with its title, the New Jersey Bribery Statute aims to regulate bribery involving official matters.

Judicial interpretations of the predecessor bribery statute provide additional guidance in interpreting the New Jersey Bribery Statute.  The Third Circuit in *United States v. Dansker* recognized that the predecessor statute, if read literally, "makes it unlawful for any individual to accept any benefit in exchange for his agreement to influence any official action in any manner." 537 F.2d 40, 48 (3d Cir. 1976).  However, the *Dansker* Court cautioned that the statute "[o]bviously" could not "be read in such a literal fashion without running afoul of the first amendment."  *Id.*  The Third Circuit construed the predecessor bribery statute as follows:

> The statute does not make criminal an agreement by a public official to influence, in an otherwise lawful manner, governmental action unrelated to his office because, in entering such an agreement, he violates some nebulous standard of propriety imposed on public officials by law.  *Rather, in order to establish a violation of the statute, it must be demonstrated: (a) that the alleged recipient, whether he be a public official or not, possessed at least the apparent ability to influence the particular public action involved; and (b) that he agreed to exert that influence in a manner which would undermine the integrity of that public action.*

*Id.* at 49 (emphasis added).  The *Dansker* decision remains good law and applies with equal force to the New Jersey Bribery Statute.  *See United States v. Bencivengo*, 749 F.3d 205, 214 n.7 (3d

Cir. 2014) (distinguishing the facts in *Dansker* and holding that the government introduced sufficient evidence to uphold the defendant's Travel Act conviction, which was premised on a violation of the New Jersey Bribery Statute).  Ultimately, the *Dansker* decision highlights that the application of the New Jersey Bribery Statute is not based merely on a defendant's status as an official.  Rather, the current bribery statute, like its predecessor, applies only where the defendant: (1) had at least the apparent ability to influence the public action involved, and (2) agreed to exercise that influence in a manner that would diminish the integrity of that public action.  *See Dansker*, 537 F.2d at 49.

### 2. Application of the Gibson Test

Applying the *Gibson* test, the Court concludes that the New Jersey Bribery Statute is not unconstitutionally overbroad in violation of the First Amendment.  With respect to the first and second *Gibson* factors, there have been numerous valid applications of the New Jersey Bribery Statute, whereas the likelihood and frequency of the impermissible applications of the statute is practically zero.  The New Jersey Bribery Statute and its predecessor have been properly applied in several cases.  *See, e.g.*, *Bencivengo*, 749 F.3d at 214-15 (affirming the Travel Act conviction of a mayor who accepted payments in exchange for exercising his influence over members of a local school board, in violation of the New Jersey Bribery Statute); *United States v. Walsh*, 700 F.2d 846, 854 (2d Cir. 1983) (upholding the Travel Act conviction of an owner of an engineering firm who paid and promised to pay a mayor in return for the mayor's promise to exercise his influence on the firm's behalf, in violation of the New Jersey Bribery Statute); *Schenkolewski*, 693 A.2d at 1186 (finding that evidence that an influential religious leader accepted benefits in exchange for exerting his influence to obtain favorable action by township committee members was sufficient to support the indictment's charges of bribery under the New Jersey Bribery

Statute); *State v. Woodward*, 689 A.2d 801, 803 (N.J. Super. Ct. App. Div. 1997) (affirming bribery conviction, under the New Jersey Bribery Statute, of a candidate for public office who offered to withdraw his candidacy and support the incumbent office holder in return for money and a public job); *see also Ferro*, 320 A.2d at 182 (affirming conviction, under the predecessor bribery statute, of a former party official who accepted money in return for promising to influence the county probation department and the county prosecutor's office); *State v. Sherwin*, 317 A.2d 414, 422 (N.J. Super. Ct. App. Div. 1974) (upholding conviction, under the predecessor bribery statute, of New Jersey's Secretary of State for accepting payments from a contractor in return for encouraging the Commissioner of Transportation to exercise favorable action on the contractor's behalf). Indeed, Ferriero himself acknowledges that "there may be a number of valid applications of *N.J.S.A.* 2C:27-2." (Def. Mov. Br. at 25; *see also* D.E. No. 18, Reply Brief in Support of Joseph Ferriero's Pretrial Motions ("Def. Reply Br.") at 8 ("Ferriero does not contend . . . that *N.J.S.A.* 2C:27-2 has no valid applications.")).

As to the second *Gibson* factor, the Court rejects Ferriero's contention that "there are far too many 'conceivably impermissible applications'" of the statute. (*See* Def. Mov. Br. at 24). Ferriero claims that the New Jersey Bribery Statute has a "broad reach [that] both criminalizes protected speech and chills future protected political speech." (*Id.*). However, his arguments with respect to the second *Gibson* factor rest on an erroneous interpretation of the New Jersey Bribery Statute. Ferriero characterizes the New Jersey Bribery Statute as a criminal statute that reaches *all* of the recommendations, opinions, and decisions of individuals acting in their private capacities merely because those individuals hold a public title. (*Id.* at 21, 24). Furthermore, he argues that the New Jersey Bribery Statute is "uniquely broad" because it prohibits the decisions, opinions, and recommendations "*of*" party officials. (*Id.* at 21). Ferriero claims that, in this regard, the New

Jersey Bribery Statute is distinguishable from the bribery statutes of forty-seven states, the District of Columbia, and the Model Penal Code, which limit criminal liability to those who receive a benefit as consideration for acts undertaken *in* their official capacity or *as* a party official or public servant. (*Id.* at 21-23).

Ferriero's expansive interpretation of the New Jersey Bribery Statute contravenes the plain language of the statute and its legislative purpose. The New Jersey Bribery Statute requires that the benefit in question be a "benefit not authorized by law," thus restricting the scope of the statute. *See Bryant*, 556 F. Supp. 2d at 410 ("[A]ll 'benefits' fall within the [New Jersey Bribery Statute's] prohibition *unless* they are authorized elsewhere." (emphasis added)). Moreover, the purpose of the New Jersey Bribery Statute is not to penalize party officials for their private, professional activities, but rather to combat public corruption. *See Ferro*, 320 A.2d at 181 (explaining that the predecessor statute is part of a "legislative scheme . . . to penalize those in an apparent position of trust who would utilize their position or relationship to influence some governmental activity of [a] public official"). Finally, the fact that the New Jersey Bribery Statute uses a different preposition than other bribery statutes is a distinction without a difference. As discussed above, the application of the New Jersey Bribery Statute is not triggered by a defendant's mere status as an official, but rather hinges on whether the defendant had the apparent ability to influence a particular public action and agreed to exercise that influence in a manner that would threaten the integrity of that action. *See Dansker*, 537 F.2d at 49. Thus, Ferriero is incorrect in asserting that "every decision, opinion, or recommendation 'of' a party official is subject to potential criminal penalties" under the New Jersey Bribery Statute. (*See* Def. Mov. Br. at 21).

Significantly, Ferriero has not proffered any examples of the New Jersey Bribery Statute's application to the lawful activities of "lobbyists, accountants, consultants, businessmen, financial

advisors, and marketing professionals," (Def. Mov. Br. at 26), despite the fact that this statute was enacted decades ago, in 1979. *Cf. United States v. Scruggs*, 714 F.3d 258, 268 (5th Cir. 2013) ("[T]he honest-services statute has been on the books for a quarter of a century . . . with no sign of chilled political endorsements or the overreaching prosecutions prophesied by [the defendant].")*, cert. denied*, 134 S. Ct. 336 (2013). During oral argument, Ferriero recited a list of county chairmen who he claimed could conceivably be punished under the New Jersey Bribery Statute for their lobbying and consulting work. (Hr'g Tr. 142:8-144:19). While Ferriero provided the Court with the titles and positions of the officials in question, he failed to demonstrate how these officials, most of whom are registered lobbyists, could be subject to criminal prosecution under the New Jersey Bribery Statute for their private, professional activities. Likewise, he failed to show how the statute would have a chilling effect on these officials' protected speech. Because the New Jersey Bribery Statute contains limiting language requiring that the benefit in question be a benefit *not* authorized by law, the likelihood and frequency of the statute's conceivably impermissible applications is practically zero. Having analyzed the first and second *Gibson* factors, the Court concludes that a comparison of these factors counsels in favor of upholding the New Jersey Bribery Statute as constitutional.

As to the third *Gibson* factor, Ferriero argues that the New Jersey Bribery Statute's "reference to 'public issue' and 'public election' means that the 'nature of the activity or conduct sought to be regulated' is political speech." (Def. Mov. Br. at 24). However, Ferriero reads the terms "public issue" and "public election" out of context. These statutory terms are qualifiers, describing the types of decisions, opinions, and recommendations that are made in exchange for a benefit not authorized by law. Contrary to Ferriero's position, the statute does not seek to regulate political speech, but rather seeks to regulate *bribery* in official and political matters. As noted

above and discussed in further detail in the Court's vagueness analysis, the statute clearly proscribes bribery, since it sets forth when "[a] person is guilty of bribery" and is entitled "Bribery in official and political matters."  N.J.S.A. 2C:27-2.

It is well-settled that the punishment of particular categories of speech, including "speech integral to criminal conduct, . . . ha[s] never been thought to raise any Constitutional problem." *United States v. Stevens*, 559 U.S. 460, 468-69 (2010); *see also Williams*, 553 U.S. at 297 ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection."). Bribery is one such category of speech that falls outside the protection of the First Amendment. *See United States v. Jeffries*, 692 F.3d 473, 478 (6th Cir. 2012) ("Words often are the sole means of committing crime—think bribery, perjury, blackmail, fraud.  Yet the First Amendment does not disable governments from punishing these language-based crimes . . . ."); *United States v. Margiotta*, 688 F.2d 108, 129 (2d Cir. 1982) (stating that it is a "chimera" to argue that the First Amendment prevents a state from prohibiting the bribery of party officials), *overruled on other grounds by McNally v. United States*, 483 U.S. 350 (1987); *United States v. Marchetti*, 466 F.2d 1309, 1314 (4th Cir. 1972) ("Threats and bribes are not protected simply because they are written or spoken . . . ."); *United States v. Asher*, 648 F. Supp. 320, 322 (M.D. Pa. 1986) (analyzing Pennsylvania's bribery statute and holding that "a statute which prohibits a party official from accepting or agreeing to accept a bribe to use his substantial influence is not constitutionally infirm").  Because the nature of the activity that the New Jersey Bribery Statute seeks to regulate is bribery, i.e., unprotected speech, the third *Gibson* factor strongly supports the constitutionality of the statute.

As to the fourth and final *Gibson* factor, Ferriero protests that the government does not have a compelling state interest in regulating an unpaid, volunteer party official like himself.

However, Ferriero's focus on the identity of the person subject to prosecution obscures the purpose of the New Jersey Bribery Statute, which is to proscribe public corruption.  The government has a compelling interest in regulating such conduct.  *See Ferro*, 320 A.2d at 180 (noting that the predecessor bribery statute sought to proscribe conduct that "is a common evil which denigrates the integrity of our public institutions"); *see also United States v. Tutein*, 82 F. Supp. 2d 442, 448 (D.V.I. 2000) ("[T]he scourge of government corruption . . . strikes at the very heart of our democratic system of governance.").  The fact that bribery is outlawed nationwide and has been proscribed in New Jersey for over a century is a testament to the significance of the state's interest in combatting corruption.  (*See* Def. Mov. Br. at 21 (noting that bribery is prohibited in "all 50 states and the District of Columbia"); *Ferro*, 320 A.2d at 180 (discussing a New Jersey bribery statute enacted in 1898)).  Accordingly, the fourth *Gibson* factor also supports the constitutionality of the New Jersey Bribery Statute.

Having applied the *Gibson* test, the Court concludes that Ferriero has failed to establish that the New Jersey Bribery Statute is facially overbroad, in violation of the First Amendment.

### C.    Ferriero's As Applied Overbreadth Challenge

Ferriero also argues that the New Jersey Bribery Statute is unconstitutionally overbroad as applied to him, "a lawyer and volunteer political activist,"  (Def. Reply Br. at 9).  In particular, he asserts that the statute "criminalizes [his] political speech."  (Def. Mov. Br. at 19).

There appears to be a circuit split as to whether it is even possible to bring an as applied overbreadth challenge.  *Compare Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006) ("All overbreadth challenges are facial challenges, because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the court."), *with Turchick v. United States*, 561 F.2d 719, 721 n.3 (8th Cir. 1977) (distinguishing between facial and as

applied overbreadth challenges and explaining that an as applied overbreadth analysis "vindicates a claimant whose conduct is within the First Amendment but invalidates the challenged statute only to the extent of the impermissible application").   In any event, the Indictment in this case alleges that Ferriero committed bribery.   (*See, e.g.*, Ind., Count One ¶¶ 5, 34, 73).   Because such conduct is not First Amendment protected activity, the application of the New Jersey Bribery Statute to Ferriero is constitutional.   Accordingly, Ferriero's as applied overbreadth challenge fails.[12]

### D.   The Vagueness Doctrine

The Court next addresses Ferriero's vagueness challenge.   The Due Process Clause of the Fifth Amendment protects individuals from being subjected to impermissibly vague laws.   *See Williams*, 553 U.S. at 304.   Vagueness in the law is especially troubling when First Amendment rights are implicated.   As the Supreme Court has made clear, "[w]here a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

To withstand a vagueness challenge under the Due Process Clause, a criminal statute must define the offense "[1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement."   *Skilling v. United States*, 561 U.S. 358, 402-03 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).   While the vagueness doctrine "addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions," *id.* at 412, "the more important

---

[12] In his supplemental brief, Ferriero asserts for the first time that the New Jersey Bribery Statute is presumptively invalid because the statute is a content-based restriction on protected speech.   (D.E. No. 21, Defendant's Supplemental Brief ("Def. Supp. Br.") at 2-3).   The Court disagrees.   As set forth above, the New Jersey Bribery Statute regulates bribery, not First Amendment protected speech.

aspect of [the] vagueness doctrine 'is not actual notice, but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement,'" *Kolender*, 461 U.S. at 358 (alteration in original) (quoting *Smith*, 415 U.S. at 574).

To determine whether a statute is void for vagueness, a court must conduct a case-specific inquiry and consider whether the "statute is vague as applied to the particular facts at issue." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010).  The party bringing the vagueness challenge bears the burden of demonstrating that the statute is vague as applied to him or her.  *See Aiello v. City of Wilmington*, 623 F.2d 845, 850 (3d Cir. 1980).

As to the fair notice prong of a court's vagueness inquiry, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *United States v. Lanier*, 520 U.S. 259, 267 (1997).  To survive a vagueness challenge, a criminal statute need only provide "fair warning" that particular conduct is prohibited.  *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992) (quoting *Colten v. Kentucky*, 407 U.S. 104, 110 (1972)); *see also Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) (holding that a vagueness challenge under the Due Process Clause "may be overcome in any specific case where reasonable persons would know that their conduct is at risk" of being subject to punishment under the statute).  Thus, a statute is deemed to be unconstitutionally vague only if "men of common intelligence must necessarily guess at its meaning."  *Broadrick*, 413 U.S. at 607 (internal quotation marks omitted).  The Supreme Court has made clear that a "statute's *mens rea* requirement further blunts any notice concern."  *Skilling*, 561 U.S. at 412 (citing *Screws v. United States*, 325 U.S. 91, 101-04 (1945) (plurality opinion)).

With respect to the arbitrary enforcement prong, a statute must provide "minimal guidelines" to law enforcement so as not to "permit a standardless sweep that allows policemen,

prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 358 (internal quotation marks and brackets omitted).  While a law must set forth "minimal guidelines" about what conduct is unlawful, "it need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (internal quotation marks omitted); *see also United States v. Petrillo*, 332 U.S. 1, 7 (1947) ("That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense.").  Indeed, "[t]he need for flexibility is especially important in the context of criminal laws aimed at public corruption." *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013)).

### E.      Ferriero's As Applied Vagueness Challenge

Turning to Ferriero's as applied vagueness challenge, Ferriero argues that the application of the New Jersey Bribery Statute to his alleged conduct is unconstitutionally vague because the New Jersey Bribery Statute does not: "(1) provide sufficient definiteness so that ordinary people (like him) can understand what conduct is prohibited, and (2) establish minimal guidelines to govern law enforcement."  (Def. Mov. Br. at 15).

With respect to Ferriero's first argument, which addresses fair notice concerns, Ferriero contends that the New Jersey Bribery Statute does not provide any guidance as to what conduct he could lawfully undertake, given that, in addition to serving as an unpaid, volunteer party official, he earns his living as a lawyer, businessman, and consultant.  (*Id.* at 15).  He argues that the duties of a lawyer mirror the conduct proscribed by the New Jersey Bribery Statute, and he asserts that the statute "does not provide any guidance about whether [he] or anyone else who earns a living as he does is undertaking a particular action as a party official or as part of his job."  (*Id.* at 16).

30

With respect to Ferriero's second argument, which addresses arbitrary law enforcement concerns, Ferriero contends that the New Jersey Bribery Statute does not establish minimal guidelines to govern law enforcement because the statute "provides no guidance to law enforcement officials about how to determine whether [he] was acting in his capacity as a party official or a private attorney at any given time." (*Id.* at 17). Ferriero claims that the vagueness of the New Jersey Bribery Statute "leaves it completely to the prosecutor to determine at which times [he] was acting in which capacity." (*Id.*).

In response, the government argues that the New Jersey Bribery Statute is not impermissibly vague as applied to Ferriero because the text of the statute clearly proscribes the conduct alleged in the Indictment, and judicial interpretations of the New Jersey Bribery Statute and similar statutes likewise provided Ferriero with adequate notice that his alleged conduct was criminal. (Gov't Opp. Br. at 17-18). The government also addresses Ferriero's contention that the New Jersey Bribery Statute is vague as applied to him because it does not provide guidelines regarding how to determine whether an individual is acting in his personal capacity or as a party official. The government responds that the "void for vagueness doctrine . . . 'does not mean that the statute must define every factual situation that may arise.'" (*Id.* at 17 (quoting *United States v. Nelson*, 712 F.3d 498, 508 (11th Cir. 2013))).

### 1.  *Ferriero's Alleged Conduct*

Because Ferriero argues that the New Jersey Bribery Statute is unconstitutionally vague as applied to the conduct charged in the Indictment, it is useful to outline the Indictment's allegations at the outset. The Indictment in this case alleges numerous times that Ferriero was acting "as BDCO Chairman" when he accepted payments. (*See* Ind., Count One ¶¶ 5, 34, 73). Furthermore, the Indictment states that Ferriero accepted these payments in exchange for obtaining various

31

forms of official action.  For example, Count One alleges that "Ferriero used [his] *power and influence to extract payments* from various individuals and entities *in exchange for his official action and inaction as BCDO Chairman and his influence over others in . . . municipal government*."  (*Id.* ¶ 5 (emphasis added)).  Additionally, Count One alleges that, from September 2002 until September 2006, "Ferriero accepted a stream of payments from the Virginia REIT . . . *in exchange* for [his] assistance, as BCDO Chairman, in obtaining endorsements and *other official action* from public officials."  (*Id.* ¶ 34 (emphasis added)).  Similarly, the Indictment alleges that, from August 2007 to July 2008, "in exchange for payments" from the software developer, "Ferriero *used his official position as BCDO Chairman and influence as a high-ranking party official* . . . to provide a favorable opinion of, and recommend, the Software Developer . . . to local government officials who were members of the BCDO." (*Id.* ¶ 73 (emphasis added); *see also id.*, Count Two ¶ 3 (noting that it "was an object of the conspiracy" that Ferriero would "carry on the unlawful activity of soliciting and accepting, through Braveside and SJC, concealed bribes and kickbacks from the Software Developer *in exchange* for [his] agreement to *use his position as BCDO Chairman to provide a favorable opinion of, recommend, and otherwise exercise official discretion* in favor of, Xquizit and C3" (emphasis added))).

### 2.  Fair Notice

Next, the Court examines whether Ferriero had fair notice of the specific conduct alleged in the Indictment.[13]  At the outset, the Court notes that, as with Ferriero's overbreadth challenge, Ferriero's vagueness challenge rests on an erroneous interpretation of the New Jersey Bribery

---

[13] The Court notes as a preliminary matter that, in assessing Ferriero's as applied vagueness challenge, it does not apply the high degree of specificity that is demanded of statutes that infringe upon First Amendment freedoms.  *See Smith*, 415 U.S. at 573.  As detailed in the Court's overbreadth analysis, the New Jersey Bribery Statute does not implicate First Amendment concerns because the statute proscribes bribery, which is unprotected speech.

Statute.  In asserting that the New Jersey Bribery Statute failed to provide him with adequate guidance, Ferriero contends that "[t]he statute does not restrict the relevant decisions, opinions, recommendations, and exercises of discretion to those made as Chairman of the BCDO; rather, *all* of Mr. Ferriero's decisions, opinions, recommendations, and exercises of discretion are subject to the statute by virtue of his mere status as Chair of the BCDO."  (Def. Mov. Br. at 16).  The Court rejected such a broad construction of the New Jersey Bribery Statute when analyzing Ferriero's overbreadth challenge.

As to Ferriero's argument that the New Jersey Bribery Statute "provides no guidance to [him] about what conduct he could lawfully undertake given that (in addition to acting as an uncompensated volunteer party official) he earns a living as an attorney, consultant, and businessman," (Def. Mov. Br. at 15), Ferriero demands a greater degree of precision than the vagueness doctrine allows.  The relevant inquiry is whether Ferriero had fair notice that his conduct, as alleged in the Indictment, was proscribed.  *See Lanier*, 520 U.S. at 267.  The Indictment in this case alleges that Ferriero acted in his capacity as BCDO Chairman and used his position and influence as BCDO Chairman when he accepted bribes.  Thus, the Court must consider whether Ferriero had fair notice that this particular conduct was proscribed; the test is not whether the New Jersey Bribery Statute provided Ferriero guidance as to the range of activities that he could lawfully undertake.  In any event, Ferriero's argument that the New Jersey Bribery Statute provides no guidance as to how to determine whether a person is acting in his capacity as a party official is a red herring.  As detailed in the Court's overbreadth analysis and discussed below, the application of the New Jersey Bribery Statute is not based on whether or not a person acts as a party official when making decisions, recommendations, and opinions.  Rather, the statute's application depends on whether an individual: (1) had at least the apparent ability to influence the

public action involved, and (2) agreed to exercise that influence in a manner that would diminish the integrity of that public action.  *Dansker*, 537 F.2d at at 49.

Contrary to Ferriero's contention, the New Jersey Bribery Statute clearly proscribes the conduct charged in the Indictment and thus provided him with fair notice that this conduct was criminal.  As recited above, the New Jersey Bribery Statute provides that "[a] person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another . . . [a]ny *benefit as consideration* for a decision, opinion, recommendation, vote or exercise of discretion of a public servant, party official or voter on any public issue or in any public election."  N.J.S.A. 2C:27-2(a) (emphasis added).  Based on the plain language of the statute alone, the New Jersey Bribery Statute applies to party officials and prohibits their acceptance of a benefit not authorized by law in exchange for their decision, opinion, recommendation, or exercise of discretion on a public issue.  Ferriero's alleged conduct—namely accepting concealed payments in exchange for using his influence and power as BCDO Chairman to (1) make recommendations and decisions on public issues and (2) influence the recommendations and decisions of public officials on public issues—undoubtedly falls within the range of conduct proscribed by the New Jersey Bribery Statute.

The Supreme Court's decision in *Skilling* underscores that the language of the New Jersey Bribery Statute is not unconstitutionally vague.  In *Skilling*, the Supreme Court refused to invalidate 18 U.S.C. § 1346, the honest services statute, as unconstitutionally vague and instead held that the statute applies to bribery and kickback schemes.  The statutory language of § 1346 does not expressly mention bribes or kickbacks.  Rather, the statute provides that: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the tangible right of honest services."  18 U.S.C. § 1346.  Nevertheless, the

Supreme Court held that "it has always been as plain as a pikestaff that bribes and kickbacks constitute honest-services fraud." *Skilling*, 561 U.S. at 412 (internal quotation marks omitted).

It is just as "plain as a pikestaff" that the New Jersey Bribery Statute proscribes bribery. In fact, the New Jersey Bribery Statute is more definite than § 1346 with respect to its regulation of bribery.  The New Jersey Bribery Statute explicitly proscribes bribery, as it outlines the circumstances under which "[a] person is guilty of bribery" and is entitled "Bribery in official and political matters."  N.J.S.A. 2C:27-2.

Furthermore, the New Jersey Bribery Statute contains a scienter requirement, thus "blunt[ing] any notice concern."  *See Skilling*, 561 U.S. at 412.  Admittedly, the New Jersey Bribery Statute does not expressly provide a *mens rea* element.  Nonetheless, the statute requires proof that a defendant acted "purposely."  *See* New Jersey Criminal Model Jury Charges, Bribery in Official and Political Matters (Bribe Recipient) (N.J.S.A. 2C:27-2) ("[T]he State must prove beyond a reasonable doubt . . . that defendant acted purposely."); *see also Staples v. United States*, 511 U.S. 600, 605-06 (1994) (discussing "the presumption favoring *mens rea*" and holding that courts typically should interpret a statute to include a scienter requirement even where the statute is silent on the matter); *State v. O'Neill*, 103 Wash. 2d 853, 859 (1985) (interpreting a bribery statute as requiring proof of a defendant's corrupt intent even though the statute did not expressly require a showing of such intent).[14]

---

[14] While Ferriero claims that the New Jersey Bribery Statute does not contain a scienter requirement, he even acknowledges that, at the very least, a "knowingly" *mens rea* element would be incorporated into the statute by virtue of New Jersey's legislative scheme.  (Def. Supp. Br. at 2 (citing N.J.S.A. 2C:2-2(b)(2); N.J.S.A. 2C:2-2(c)(3)); *see also* N.J.S.A. 2C:2-2(c)(3) (providing that, where a statute does not expressly state a culpability requirement, the statute "should be construed as defining a crime with the culpability defined in paragraph b.(2) of this section"); N.J.S.A. 2C:2-2(b)(2) (setting forth the definition of "knowingly").  Thus, there is no dispute that the New Jersey Bribery Statute has a *mens rea* requirement.

Besides the plain language of the statute, judicial interpretations of the New Jersey Bribery Statute and its predecessor provided Ferriero with fair notice that his conduct, as alleged in the Indictment, was proscribed.  *See U.S. ex rel. Clark v. Anderson*, 502 F.2d 1080, 1083 (3d Cir. 1974) ("As concerns fair notice, . . . the public may reasonably be charged with notice not only of the language of a statute but also of prior judicial determination of its meaning."); *see also Lanier*, 520 U.S. at 266 ("[C]larity at the requisite level may be supplied by judicial gloss . . . .").

The Third Circuit's decision in *Dansker* confirms that the New Jersey Bribery Statute is narrower than Ferriero's interpretation of the statute as criminalizing *all* of the decisions, recommendations, and opinions *of* a party official.  In *Dansker*, the record showed that the vice chairman of a city parking authority (i.e., a public official) withheld his opposition to a project under review by a local zoning board in exchange for money from a private developer. Nonetheless, the Third Circuit reversed the defendant's Travel Act conviction, which was premised on violating the predecessor bribery statute, because there was no evidence that this public official defendant "had any ability, actual or apparent, to influence official decisions concerning the project in his official capacity, or that the alleged bribers believed he could do so by virtue of his public office."  *Dansker*, 537 F.2d at 50.  In reaching this conclusion, the Third Circuit emphasized that, on the facts before it, the defendant's "status as a public official . . . really ha[d] no bearing on the issue of whether [his] activities violated the particular statute involved." *Id.*  Furthermore, the *Dansker* Court made clear that, to establish a violation of the predecessor bribery statute, "it must be demonstrated: (a) that the alleged recipient, whether he be a public official or not, possessed at least the apparent ability to influence the particular public action involved; and (b) that he agreed to exert that influence in a manner which would undermine the integrity of that public action."  *Id.* at 49.  Thus, in addition to the plain language of the statute,

*Dansker* also provided Ferriero with fair notice that the conduct alleged in the Indictment was criminal.  (*See, e.g.*, Ind., Count One ¶¶ 5, 73).

Besides *Dansker*, several other cases illustrate the type of conduct prohibited under the New Jersey Bribery Statute and confirm that Ferriero's alleged conduct falls squarely within the range of proscribed conduct.  In *Schenkolewski*, the New Jersey Appellate Division found that there was sufficient evidence to support an indictment charging Martin Buckley, the owner of a cogeneration facility; Yisroel Schenkolewski, an influential rabbi of the Lakewood community; and Abraham Penzer, Schenkolewski's lawyer and confidant, with committing bribery in violation of the New Jersey Bribery Statute.  693 A.2d at 1185-86.  In that case, there was no dispute that Schenkolewski was a public official, as he served as chairman of Lakewood's zoning board and liaison to the town's planning board.  *Id.* at 1187.  Unlike Schenkolewski, neither Buckley nor Penzer were public servants.  *Id.*  The *Schenkolewski* decision does not identify Buckley or Penzer as party officials either.  The indictment in that case alleged that Schenkolewski, with Penzer's assistance, received money from Buckley in exchange for exercising his influence over the Lakewood township committee to obtain favorable action facilitating the building of Buckley's cogeneration facility.  In finding that there was sufficient evidence to sustain the bribery charges against all three defendants, including the non-officials, the Appellate Division held that "[u]nder *N.J.S.A.* 2C:27-2, neither the offeror nor the recipient of the bribe need be a public official to prove bribery.  Rather, it is sufficient if the recipient created the understanding with the briber that he could influence matters *in connection with an official duty*."  *Id.* at 1185 (emphasis added).

In *Ferro*, a former leader of the Democratic party in a section of Jersey City was convicted under the predecessor bribery statute for accepting and agreeing to accept bribes in exchange for obtaining, through his influence and apparent power, particular actions by the county probation

department, the county prosecutor's office, and the New Jersey courts. 320 A.2d at 178. The defendant did not hold a government position at the time of the offense, and he appealed his conviction, asserting that a person charged with giving or receiving a bribe must be shown to be a public official at the time the offense was committed. The Appellate Division rejected this argument, explaining that the language of the predecessor statute "omits any requirement that the prohibited action involve the actual participation of an official. Rather, the bribe must be directed towards official action." *Id.* at 179. Ultimately, the Appellate Division sustained the defendant's conviction, reasoning that:

> The most reasonable interpretation of [the predecessor bribery statute] is that it was designed to broaden the offense of bribery so as to . . . include the peddling of influence by a person in an apparent position of access to a public official. Such activity is not penalized by the common law. Yet, *being a common evil which denigrates the integrity of our public institutions, the Legislature undoubtedly intended to proscribe such conduct.*

*Id.* at 180 (emphasis added).

In *Sherwin*, the New Jersey Secretary of State and the solicitor of funds for the Republican Party challenged their convictions for accepting bribes from a contractor in exchange for asking the Commissioner of Transportation to influence bidding on a highway construction project. 317 A.2d at 417-18. The Appellate Division affirmed the defendants' bribery convictions, reasoning that "[t]he necessary corrupt intent" to sustain their convictions was "supplied simply by showing that the opportunity was used to perform a public duty as a means of acquiring an unlawful benefit." *Id.* at 422 (citing *State v. Begyn*, 34 N.J. 35, 48 (1961)). The court explained that "[t]he offense of receiving a bribe under [the predecessor bribery statute] is complete upon a showing that defendants received a thing of value as a bribe to procure *any act appertaining to any office or department of the government.*" *Id.* at 422 (emphasis added).

Together, *Schenkolewski*, *Ferro*, and *Sherwin* confirm that the New Jersey Bribery Statute is meant to reach: (1) officials that abuse their positions for personal profit and (2) those that, through their access to or influence over officials, induce officials to abuse their positions.  Each of these cases had some element of official action.  In *Schenkolewski*, the relevant official action involved the votes of the Lakewood township committee members.  In *Ferro*, the relevant official actions were the actions of the probation department, the county prosecutor's office, and the New Jersey courts.  Then, in *Sherwin*, the pertinent official action was the bidding of a highway reconstruction project by the Commissioner of Transportation.  Collectively, these cases confirm that Ferriero's alleged conduct is proscribed by New Jersey's current bribery statute, and thus these cases provided Ferriero with sufficient notice.

Significantly, several Courts of Appeals have rejected as applied vagueness challenges to other bribery statutes and held that the defendants had fair notice that their conduct was prohibited.  For example, in *Nelson*, the Eleventh Circuit considered an as applied vagueness challenge brought by Tony Nelson, an unpaid, part-time member of the Jackson Port Authority's board of directors who was convicted of accepting concealed payments from a private dredging contractor to act as a "consultant" for the company.  712 F.3d at 501-03.  Nelson argued that the honest services, mail fraud, and federal funds bribery statutes under which he was convicted, *see* 18 U.S.C. §§ 1341, 1346, and 666(a)(1)(B), did not provide him with adequate notice that his conduct was illegal.  In particular, he argued that these statutes "lack[ed] clear criterion of guilt distinguishing between lawful and unlawful conduct."  712 F.3d at 505 (internal quotation marks omitted).  Similar to Ferriero's contention, Nelson argued that, as an unpaid, part-time volunteer, his particular conduct was lawful.  Specifically, he claimed that, in his role as an unpaid, part-time board member, he was permitted to do business with companies that contracted with the Jackson Port Authority so

long as he abstained from voting on matters in which he might have a conflict of interest.  The Eleventh Circuit rejected Nelson's vagueness challenge, concluding that his quid pro quo arrangement with the private dredging company was the type of "classic" bribery scenario that fit "squarely within the range of conduct that Congress aimed to prohibit." *Id.* at 509.

Similarly, the Second Circuit in *Rosen* rejected a defendant's as applied vagueness challenge to the federal bribery and honest services fraud statutes under which he was convicted. The Second Circuit held that the defendant had sufficient notice that it was illegal to pay state legislators to take official action on his or his company's behalf as the opportunities arose. *Rosen*, 716 F.3d at 700.  In reaching this conclusion, the *Rosen* Court noted that "critically, the requirement that the Government prove a defendant's specific intent to bribe eliminates the possibility that he will be prosecuted for bribery without fair notice." *Id.*

As in *Nelson* and *Rosen*, Ferriero had sufficient notice that the bribery statute at issue prohibits a party official from accepting bribes in his capacity as a party official.  The Indictment alleges a "classic" bribery scenario that falls "squarely within the range of conduct" that the New Jersey legislator sought to prohibit.  *See Nelson*, 712 F.3d at 509. Moreover, the New Jersey Bribery Statute requires the Government to prove that Ferriero acted purposely, thus "eliminat[ing] the possibility that he will be prosecuted for bribery without fair notice."  *See Rosen*, 716 F.3d at 700.  Because the New Jersey Bribery Statute gave Ferriero sufficient notice that his alleged conduct was prohibited, Ferriero's vagueness challenge fails the fair notice prong of the Court's vagueness inquiry.

### 3. Arbitrary Law Enforcement

Finally, the Court addresses whether the New Jersey Bribery Statute provided minimal guidelines to govern law enforcement.  The crux of Ferriero's argument is that the statute does not

provide law enforcement and prosecutors guidance to determine whether an individual is acting in his personal or official capacity.  As the Court has already noted in its fair notice analysis, this argument is a red herring because the application of the New Jersey Bribery Statute does not hinge on an individual's status as an official in any event.

As detailed above, the plain text of the New Jersey Bribery Statute, together with judicial interpretations of the statute, provided Ferriero with fair notice that his alleged conduct was criminal.  Likewise, the plain text and judicial interpretations of the statute supplied law enforcement with the sufficient guidelines necessary to govern law enforcement.

Ferriero contends that the New Jersey Bribery Statute allows for the same arbitrary enforcement that the Supreme Court found troubling in *Smith*.  (Def. Mov. Br. at 18).  However, the statute at issue in *Smith* is significantly different than the New Jersey Bribery Statute.  Moreover, the reasoning in *Smith* provides further support for upholding the constitutionality of the New Jersey Bribery Statute.  In *Smith*, the Supreme Court held that a Massachusetts flag misuse statute that subjected to criminal liability anyone who "publicly . . . treats contemptuously the flag of the United States" was void for vagueness.  415 U.S. at 573.  The Court reasoned that the phrase "treats contemptuously" was "sufficiently unbounded" and that "[s]tatutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections."  *Id.* at 575.  In reaching this determination, the Court emphasized that the statutory phrase "treats contemptuously" lacked any narrowing state court interpretation at the time of the case.  The Court explained that, as a result, it did not have authority to cure the defect.  *Id.* (citing *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369 (1971) (discussing the Court's practice of constitutional avoidance)).

By contrast, the language in the New Jersey Bribery Statute is not "unbounded" so as to allow for a standardless sweep. *See id.* at 575. None of the terms in the New Jersey Bribery Statute contain the level of subjectivity that the Supreme Court found troubling in *Smith*. Moreover, unlike the statute in *Smith*, the New Jersey Bribery Statute and its predecessor have been interpreted by numerous courts, and thus law enforcement, as well as this Court, has the benefit of these courts' narrowing interpretations of the statute.

Because the New Jersey Bribery Statute provided Ferriero with fair notice that his alleged conduct was criminal and supplied law enforcement with adequate guidance, the Court concludes that the New Jersey Bribery Statute is not unconstitutionally vague as applied to Ferriero. Since Ferriero's three constitutional challenges to the New Jersey Bribery Statute lack merit, the Court denies Ferriero's motion to dismiss Counts One, Two, and Three of the Indictment.

**VI.    Conclusion**

For the reasons discussed above, the Court denies Ferriero's motions to: (1) dismiss Count One of the Indictment for failure to allege a RICO offense, (2) dismiss Counts One, Two, and Three of the Indictment on the ground that the New Jersey Bribery Statute is unconstitutionally overbroad, both facially and as applied to him, and (3) dismiss Counts One, Two, and Three of the Indictment on the ground that the New Jersey Bribery Statute is unconstitutionally vague as applied to him.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**