<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | **Criminal Action No. 13-592 (ES)** |
| **v.** | **OPINION** |
| **JOSEPH A. FERRIERO** | |
| **Defendant.** | |

**SALAS, DISTRICT JUDGE**

This matter comes before the Court by way of Defendant Joseph A. Ferriero's motions for acquittal and a new trial pursuant to Federal Rules of Criminal Procedure 29(a), 29(c), and 33. (D.E. Nos. 107, 138). On April 16, 2015, a jury convicted Ferriero of violating the Racketeer Influenced and Corrupt Organization Act (Count One) and the Travel Act (Count Three). (D.E. No. 127). The jury also found Ferriero guilty of Wire Fraud (Count Five). (*Id.*). However, the jury acquitted Ferriero of Conspiracy to Violate the Travel Act and Commit Mail and Wire Fraud (Count Two) and Mail Fraud (Count Four).[1] (D.E. No. 127).

For the reasons discussed below, the court DENIES Defendant Joseph A. Ferriero's motions for acquittal and a new trial.

---

[1] Because Ferriero was acquitted of Counts Two and Four, his motion for acquittal with respect to those counts is moot. *See, e.g., United States v. Baukman*, No. 05-440-8, 2010 WL 3448202, at *2 n.1 (E.D. Pa Aug. 31, 2010) ("Since the jury returned a verdict of not guilty on Count 187, Baukman's Rule 29(a) motion is moot with regard to that count."); *United States v. Atl. States Cast Iron Pipe Co.*, No. 03-852, 2007 WL 2282514, at *82 (D.N.J. Aug. 2, 2007) (holding that Rule 29 motion filed during trial was moot as to a particular count, given the jury's verdict of not guilty); *United States v. Potter*, No. 03-081, 2005 WL 2367677, at *1 (D.R.I. Sept. 27, 2005) ("Defendants' motions for judgment of acquittal are moot with respect to those counts on which the jury returned a verdict of not guilty. Accordingly, the Court considers the motions only with respect to those counts on which Defendants were convicted . . . ."). Therefore, the Court entertains Ferriero's motions for acquittal with respect to Counts One, Three, and Five only.

## I.      FACTUAL BACKGROUND & PROCEDURAL HISTORY

On September 11, 2013, a federal grand jury sitting in Newark, New Jersey returned a five-count indictment against Ferriero (the "Indictment"). (D.E. No. 1, Indictment ("Ind.") at 1). Count One of the Indictment alleges that Ferriero violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), by conducting the affairs of a political organization through a pattern of racketeering activity, including bribery, over the course of three schemes. (Ind., Count One). Count Two alleges that Ferriero engaged in a conspiracy, in violation of 18 U.S.C. § 371, to violate the Travel Act, 18 U.S.C. § 1952(a), and to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343. (*Id.*, Count Two). Count Three alleges that Ferriero violated the Travel Act. (*Id.*, Count Three). Finally, Counts Four and Five allege that Ferriero committed mail and wire fraud. (*Id.*, Counts Four-Five).

The Court's January 15, 2015 Opinion, (D.E. No. 35, January 15, 2015 Opinion ("Op.")), provides a detailed recitation of the Indictment's allegations regarding the three schemes and thus the Court only discusses the allegations in limited fashion here.

Count One alleges that Ferriero committed seven racketeering acts over the course of three illegal schemes as Chairman of the Bergen County Democratic Organization ("BCDO"). First, the Indictment alleges that Ferriero engaged in the Government Grants Consulting, LLC ("GGC") Bribery and Kickback Scheme by bribing Dennis J. Oury—Borough Attorney for the Borough of Bergenfield—and conferring upon him a percentage of GGC's profits in exchange for Oury's performance of his official duties. (Ind., Count One ¶¶ 6-33). With respect to the Retail & Entertainment Project Bribery and Extortion Scheme—also known as the "Xanadu" Scheme—the Indictment alleges that Ferriero accepted a stream of payments in exchange for his assistance, as Chairman of the BCDO, to obtain official action and endorsements for a retail and entertainment

project in New Jersey.  (*Id.* ¶¶ 34-67).  Last, with respect to the SJC Consulting, LLC ("SJC") Scheme, the Indictment alleges that Ferriero engaged in various illegal actions, including five acts of bribery, by agreeing to recommend and provide a favorable opinion of John Carrino and his software, C3, to local government officials in Bergen County in exchange for a kickback of C3's revenue.  (*Id.* ¶¶ 68-76).

Count Two alleges that Ferriero engaged in a conspiracy to use instrumentalities of interstate commerce to promote and distribute the proceeds of bribery and to commit mail and wire fraud with respect to the SJC Scheme.  (Ind., Count Two ¶¶ 1-4).  Count Three alleges that Ferriero violated the Travel Act by using U.S. mail and facilities in interstate commerce to distribute the proceeds of the SJC Scheme.  (Ind., Count Three ¶¶ 1-2).  Finally, Counts Four and Five allege that Ferriero engaged in mail and wire fraud with respect to the SJC Scheme.  (Ind., Counts Four-Five ¶¶ 1-4).

Trial commenced on February 24, 2015 with jury selection.  At trial, the government called twenty-two witnesses.[2]  On March 26, 2015, the government rested its case-in-chief.  Ferriero moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) on all five Counts.  (*See* D.E. No. 107).  The parties briefed the motion, and the Court reserved ruling on the motion pursuant to Rule 29(b).  Thereafter, Ferriero presented his case and called nine witnesses. The defense rested its case on April 2, 2015.  That same day, the government presented one piece of rebuttal evidence and rested its case.  Following a charge conference, final instructions to the jury, and the parties' closing arguments, the jury began deliberating on April 9, 2015.

On April 16, 2015, the jury returned a partial verdict.  (D.E. No. 127).  The jury convicted Ferriero of Counts One, Three, and Five and acquitted Ferriero of Counts Two and Four.  (*Id.*).

---

[2] One witness—Barbara Lawton—was unavailable.  The government read her testimony into the record.

With respect to Count One, the jury found Ferriero guilty of Racketeering Acts #3A, #4, #5, #6, and #7A, all of which charged Ferriero with violating New Jersey's bribery statute, N.J.S.A. 2C:27-2 (the "New Jersey Bribery Statute"). (*Id.*). On the special verdict form, the jury indicated that it was unable to unanimously find Ferriero guilty of Racketeering Acts #1 and #2. (*Id.*). Following the verdict, Ferriero moved for a judgment of acquittal pursuant to Rule 29 and a new trial pursuant to Rule 33. (*See* D.E. No. 137).

## II.     LEGAL STANDARDS

### A.     RULE 29

Pursuant to Federal Rule of Criminal Procedure 29(a), "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Where a defendant moves for a judgment of acquittal at the close of the government's case, "[t]he court may reserve decision on the motion, proceed with the trial . . . , submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty." Fed. R. Crim. P. 29(b). Where a court reserves decision, it must decide the Rule 29(a) motion based on the evidence at the time the ruling was reserved. *Id.* ("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved."); *see also United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) ("[T]he District Court was required to, and properly did, determine whether an acquittal was appropriate based solely on the evidence presented by the government.").

Federal Rule of Criminal Procedure 29(c) provides that a defendant may move for a judgment of acquittal or renew such a motion within fourteen days after the jury returns a guilty verdict. Fed. R. Crim. P. 29(c).

"The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Lore*, 430 F.3d 190, 203 (3d Cir. 2005) (quoting *United States v. Serafini*, 233 F.3d 758, 770 (3d Cir. 2000)).  In evaluating a motion for acquittal, "a court 'must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury.'" *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *Brodie*, 403 F.3d at 133).  Rather, a district court "must view the evidence and inferences logically deducible therefrom in the light most favorable to the government . . . ." *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1987).  The Court must "examine the totality of the evidence, both direct and circumstantial." *United States v. Gambino*, 314 F.3d 163, 170 (3d Cir. 2011).  Furthermore, all credibility issues must be resolved in the government's favor.  *United States v. Scanzello*, 832 F.2d 18, 21 (3d Cir. 1987).

Ultimately, the Court must uphold a jury's verdict if "*any* rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Claxton*, 685 F.3d 300, 305 (3d Cir. 2012) (alterations omitted and emphasis added).  Significantly, "the government's proof need not exclude every possible hypothesis of innocence." *United States v. Ozcelik*, 527 F.3d 88, 94 (3d Cir. 2008); *see also United States v. Sandini*, 888 F.2d 300, 311 (3d Cir. 1989) (explaining that the "evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt" (internal quotation marks omitted)).

### B.    RULE 33

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R.

Crim. P. 33.  The Court may grant a Rule 33 motion only if it "believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted."  *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (internal quotation marks omitted).  In reviewing the evidence, a district court "exercises its own judgment in assessing the Government's case."  *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002).  Rule 33 motions for a new trial "are to be granted sparingly and only in exceptional cases." *Brennan*, 326 F.3d at 189 (quoting *Gov't of the V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).

## III.    RULE 29(A) MOTION FOR JUDGMENT OF ACQUITTAL

### A.    Count One

Count One of the Indictment alleges that Ferriero committed racketeering in violation of RICO, 18 U.S.C. § 1962(c).  (Ind., Count One).  Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To establish a RICO violation, the government must prove: "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated . . . , either directly or indirectly, in the conduct of the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity."  *United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011).  The fourth requirement is known as the nexus requirement.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 371 (3d Cir. 2010) [hereinafter *Ins. Brokerage*].

Ferriero was found guilty of committing Racketeering Acts #3A, #4, #5, #6, and #7A in connection with the SJC Scheme.  Racketeering Acts #3A, #4, #5, #6, and #7A charged Ferriero

with bribery in violation of the New Jersey Bribery Statute.   More specifically, Ferriero was charged with soliciting, accepting, or agreeing to accept a benefit from John Carrino—a kickback percentage of C3's revenue—in exchange for Ferriero's recommendation and favorable opinion of C3 as BCDO Chairman.   Pursuant to the SJC Scheme, Ferriero would provide consulting services for Carrino's emergency notification system, C3.   (*See* Government Exhibit ("GX") 556). In exchange, Carrino would pay Ferriero twenty-five percent of the gross revenue Carrino received from contracts between municipalities and C3.   (*See* GX 556).   Each individual Racketeering Act represents a different borough or municipality for which Ferriero recommended C3: Racketeering Act #3A—Borough of Dumont; Racketeering Act #4—Township of Teaneck; Racketeering Act #5—Borough of Wood-Ridge; Racketeering Act #6—Township of Saddle Brook; and Racketeering Act #7A—Borough of Cliffside Park.

Ferriero asserts that he is entitled to a judgment of acquittal on Count One because, at the close of the government's case-in-chief, no rational jury could find Ferriero guilty of a RICO violation beyond a reasonable doubt.   (D.E. No. 107, Brief in Support of Joseph Ferriero's Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29 ("Def. 29(a) Mov. Br.") at 1).   In particular, Ferriero contends that: (1) "there is no mention of the BCDO at all in the allegations regarding" the Racketeering Acts, (*id.* at 10, 11, 13, 14, 16); (2) the government failed to provide "evidence sufficient to establish the requisite nexus" between the Racketeering Acts and the BCDO, (*id.* at 10, 13, 14, 16); and (3) the government failed to provide evidence supporting the bribery predicates, (*id.* at 10, 12, 13, 14, 16).   Because Ferriero was only found guilty of the bribery predicates and sub-predicates for Racketeering Acts #3A, #4, #5, #6, and #7A, the Court does not address the sufficiency of the evidence for Racketeering Acts #1 and #2, nor does the Court address

the sufficiency of the evidence for the alternative sub-predicates #3B, #3C, #3D, #7B, #7C, and #7D.

### 1. The Indictment's Allegations

At the outset, the Court notes that Ferriero's argument that "there is no mention of the BCDO at all in the allegations regarding" Racketeering Acts #3A, #4, #5, #6, and #7A is improper for the motion presently before the Court.  Under Rule 29(a), "the district court must determine whether the Government has adduced *sufficient evidence* respecting each element of the offense charged . . . ."  *United States v. Giampa*, 758 F.2d 928, 934 (3d Cir. 1985) (emphasis added). Ferriero's argument does not address the sufficiency of the evidence adduced at trial, but rather addresses the sufficiency of the allegations in the Indictment.  Indeed, the Court considered this argument in its January 15, 2015 Opinion denying Ferriero's motion to dismiss the Indictment. (*See* Op. at 11-15 (denying Ferriero's motion to dismiss the Indictment and concluding that the government sufficiently alleged a RICO nexus)).  Accordingly, the Court will not entertain Ferriero's renewed challenge to the allegations contained in the Indictment.

### 2. RICO Nexus

Next, Ferriero asserts that the government failed to provide "evidence sufficient to establish the requisite nexus" between the Racketeering Acts and the BCDO.  (*See* Def. 29(a) Mov. Br. at 10, 11, 13, 14, 16).  To establish the fourth element of a RICO offense—that the defendant participated through a pattern of racketeering activity—the government must sufficiently establish a nexus between the conduct of the affairs of the enterprise and the pattern of racketeering activity.  *Ins. Brokerage*, 618 F.3d at 372.  To establish this nexus, the defendant must have participated in the conduct of the enterprise's affairs "through—that is, by means of, by consequence of, by reason of, by agency of, or by the instrumentality of—a pattern of

racketeering activity." *Id.* (internal quotation marks omitted).  As the Court noted in its previous

Opinion, numerous courts have recognized that a defendant's use of power and authority deriving

from the enterprise established a sufficient nexus under RICO, both as an independent factor and

in conjunction with the defendant's use of physical resources.  (*See* Op. at 13-14 (citing *United

States v. Marino*, 277 F.3d 11, 27-28 (1st Cir. 2002) (noting that defendant's use of his or her

position in the enterprise to commit the racketeering acts independently suffices to establish the

nexus requirement); *United States v. Grubb*, 11 F.3d 426, 439 (4th Cir. 1993) (finding a nexus

where a state judge used the physical resources from his judicial office—such as the telephone—

in addition to the "prestige and power of the office itself"))).

For Racketeering Acts #3A, #4, #5, #6, and #7A, Ferriero asserts that the government failed

to produce

> evidence demonstrating that any meetings with . . . decisionmakers occurred at
> BCDO offices, or that any emails or mail were sent from or received at BCDO
> offices, or that BCDO letterhead, phones, or email were used . . . or that moneys
> generated from the contract[s] [with] C3 . . . flowed into BCDO bank accounts or
> that BCDO funds were used to establish C3 or SJC.

(Def. 29(a) Mov. Br. at 10).  Ferriero made a similar argument in his pretrial motion to dismiss

the Indictment.  According to Ferriero, the Indictment should have been dismissed because

> [n]owhere in the pleading of the specific racketeering acts . . . is the BCDO
> mentioned. . . . [N]owhere does the Indictment allege that the payments were
> issued by the BCDO, or to have flowed through BCDO bank accounts, or to have
> been received at BCDO premises. . . . [N]one of the communications [are] alleged
> to have been made on BCDO letterhead, or via BCDO phone lines or email
> systems, or to have been mailed to or from BCDO premises.

(D.E. No. 10, Brief in Support of Joseph Ferriero's Pretrial Motions ("Def. Pretrial Br.") at 32).

However, much like the Court concluded in its previous Opinion, Ferriero's argument is

unpersuasive.

Upon review of the evidence presented during the government's case-in-chief, the Court concludes that a rational trier of fact could find that the government established the requisite nexus between Racketeering Acts #3A, #4, #5, #6, and #7A and the conduct of the affairs of the BCDO. The government elicited testimony from multiple witnesses that it was not unusual for Ferriero to recommend vendors to Democratic officials in his capacity as BCDO Chairman, and that officials took these recommendations seriously. For example, Louis D'Arminio, Mayor of Saddle Brook, testified that he asked Ferriero for a recommendation regarding an engineering company at a political convention in 2002. (3/19 Tr. 87:12-23). D'Arminio went on to testify that Ferriero recommended an engineering company and that it was not unusual for Ferriero to recommend vendors. (3/19 Tr. 87:22-88:11, 123:7-10). Similarly, Paul Sarlo, Mayor of Wood-Ridge, testified that it was common for the county chairmen of both parties to make recommendations, and that Ferriero made recommendations and gave advice to municipal officials about vendors as BCDO Chairman. (3/20 Tr. 29:24-30:14). While Dumont Mayor Mathew McHale testified that it was not the BCDO Chairman's official duty to make recommendations, (3/25 p.m. Tr. 74:9-11), he indicated that Ferriero advised county officials about the hiring of professionals. (3/25 a.m. Tr. 101:15-21). Importantly, numerous witnesses testified that Ferriero's recommendations carried great weight and were taken into consideration when hiring vendors. (3/19 Tr. 122:16-18; 3/25 a.m. Tr. 74:12-16, 135:20-136:15).

Moreover, multiple witnesses testified that the BCDO routinely held events for the purpose of bringing Democratic officials and vendors together. (3/20 Tr. 29:10-23). One event in particular was the BCDO annual reception at the League of Municipalities convention. (3/20 Tr. 29:2-5; 3/19 Tr. 86:19-87:18). Elected officials, municipal officials, and vendors who work with municipalities would attend the League of Municipalities convention for networking. (3/20 Tr.

29:15-23).  Elected officials and public officials would review the vendors' services and products.

(3/20 Tr. 29:20-22).  Therefore, based on the foregoing evidence produced by the government, a

rational juror could find that one of Ferriero's duties as BCDO Chairman was to provide opinions

and recommendations regarding vendors, and that he had significant power when doing so.

Furthermore, the government introduced evidence from which a rational trier of fact could

find that Ferriero performed his duty as BCDO Chairman (*i.e.*, recommend a vendor) in connection

with Racketeering Acts #3A, #4, #5, #6, and #7A.  For example, the government introduced the

April 22, 2008 written agreement between Ferriero's consulting company, SJC Consulting

("SJC"), and Carrino's company, Braveside Capital, LLC ("Braveside"), (the "Agreement").  (GX

556).  The Agreement "memorialized the agreed upon terms . . . entered into as of September 2007

between Braveside . . . and SJC . . . ."  (GX 556).  Pursuant to the Agreement, Ferriero would

provide "governmental relations consulting services required in connection with marketing . . . C3

and any other related products or services."  (GX 556).  In exchange, Braveside would pay SJC

"[a] professional fee of twenty-five percent (25%) gross revenue generated from the sale of . . .

C3."  (GX 556).

Additionally, the government introduced the Bergen County Municipality Guide issued by

Bergen County.  (GX 504A; *see* 3/25 p.m. Tr. 16:2-21; 3/18 Tr. 24:7-19).  The Guide listed contact

information for public officials in municipalities throughout Bergen County and included their

party affiliation.  (*See* GX 504A; *see also* 3/25 p.m. Tr. 17:9-13).  Next to some of the

municipalities listed on the Guide, Ferriero hand wrote the names of party officials.  (*See* GX 504;

3/25 p.m. Tr. 17:2-21:3).  The majority of the municipalities that Ferriero marked were

Democratic, while the majority of the unmarked municipalities were Republican.  (*See* GX 504A).

Indeed, some of the Republican municipalities were marked with an X.  (*See* GX 504A).

In addition to the marked-up Guide, the government introduced two documents that were exchanged between Ferriero and Carrino that contained status updates on C3's progress in various municipalities. (GX 547, 554). For example, Carrino indicated that Ferriero was "reaching out to the Democratic Chair regarding a meeting" in Leonia. (GX 547). Based on this evidence, a rational trier of fact could infer that Ferriero was utilizing his power as Chairman of the BCDO—a Democratic organization—to recommend C3.

With respect to each individual Racketeering Act, the Court concludes that the government introduced enough evidence from which a rational juror could conclude that a nexus existed. In support of Racketeering Act #3A—Borough of Dumont—the government called Mayor Matthew McHale as a witness. According to McHale, he would usually see Ferriero and Carrino at political events, including BCDO sponsored events. (3/25 p.m. Tr. 9:11-20). On one occasion, McHale, Ferriero, and Carrino discussed Dumont's interest in revamping its website. (3/25 p.m. Tr. 9:21-10:13). McHale testified that Ferriero recommended C3 to the Borough of Dumont and checked on Dumont's progress in hiring C3. (3/25 p.m. Tr. 10:14-16, 12:24-13:8; *see* GX 515 (email from Ferriero to McHale asking "How r we doing with C3")). When asked in what capacity Ferriero was acting when he checked on the status of Dumont hiring C3, McHale responded "[a]s the Bergen County Chairman, as my friend, as my mentor." (3/25 p.m. Tr. 15:7-10; *see also* 3/25 p.m. Tr. 33:18-34:4).

Based on the foregoing testimony and evidence, a rational jury could find that Ferriero conducted the affairs of the BCDO (*i.e.*, recommended vendors in his capacity as Chairman, including at BCDO sponsored events) through a pattern of bribery with respect to the Borough of Dumont. Mainly, a rational juror could find that Ferriero agreed to accept a benefit from Carrino

12

in exchange for his recommendation to Dumont, and that he conducted the affairs of the BCDO by making a recommendation to Dumont in accordance with the Agreement.

In support of Racketeering Act #4—Township of Teaneck—the government introduced documentary evidence. On the Bergen County Municipality Guide, the name "Rudy" appears in Ferriero's handwriting next to the Township of Teaneck. (GX 504A). On August 23, 2007, Carrino emailed Ferriero stating that: "the gentleman you met with that morning (Teaneck), got me in touch with the Teaneck BA, who I have scheduled for 2 pm Monday." (GX 506). On August 24, 2007, Carrino emailed El-natan Rudolph, a member of the Teaneck Council, stating in relevant part: "Thanks again for putting me in touch with Ms. Fall in Teaneck. We're meeting on Monday . . . ." (GX 509). Carrino forwarded his August 24, 2007 email to Ferriero stating "fyi." (GX 509). On July 27, 2008, Ferriero received a check from Carrino containing the following memo: "Q1: Teaneck Q2: Teaneck." (GX 54).

Based on the above circumstantial evidence, a rational jury could find that Ferriero conducted the affairs of the BCDO through a pattern of bribery with respect to the Township of Teaneck. In particular, a rational juror could infer that Ferriero agreed to accept a benefit from Carrino in exchange for his recommendation to Teaneck.

In support of Racketeering Act #5—Borough of Wood-Ridge—the government called Mayor Paul Sarlo as a witness. Sarlo testified that, while at a BCDO event, Ferriero recommended that Wood-Ridge hire C3. (3/20 Tr. 32:9-33:6). Ferriero continued to recommend Carrino to Wood-Ridge and, according to Sarlo, "[h]e pushed hard for C3." (3/20 Tr. 35:17-24). Ultimately, Wood-Ridge decided not to hire C3, and Ferriero confronted Sarlo—in a tense tone—at a BCDO golf outing about the decision. (3/20 Tr. 36:10-38:20). Sarlo testified that he understood Ferriero

13

to be recommending C3 in his capacity as BCDO Chairman and did not know that Ferriero stood to gain financially if Wood-Ridge signed a contract with C3. (3/20 Tr. 38:21-39:6).

Based on Sarlo's testimony, a rational jury could find that Ferriero conducted the affairs of the BCDO through a pattern of bribery with respect to the Borough of Wood-Ridge. Mainly, a rational juror could find that Ferriero agreed to accept a benefit from Carrino in exchange for his recommendation to Wood-Ridge, and that he conducted the affairs of the BCDO by making a recommendation to Wood-Ridge in accordance with the Agreement.

In support of Racketeering Act #6—Township of Saddle Brook—the government called Mayor Louis D'Arminio as a witness. According to D'Arminio, Ferriero introduced him to Carrino at an event the BCDO held at the League of Municipalities convention in Atlantic City. (3/19 Tr. 98:15-99:10). During the introduction, Ferriero told D'Arminio that Carrino had a good product. (3/19 Tr. 99:14-100:1). D'Arminio testified that Ferriero made this recommendation in his capacity as BCDO Chairman. (3/19 Tr. 100:5-7). Because of Ferriero's recommendation, D'Arminio met with Carrino to discuss Saddle Brook's need for a website. (3/19 Tr. 100:8-101:4). D'Arminio proposed C3 to the Saddle Brook township counsel for a vote. (3/19 Tr. 107:8-10; *see* GXs 530, 533). When Ferriero made this recommendation, however, he did not tell D'Arminio that he was acting as a consultant for C3, or that he would receive twenty-five percent of the revenue derived from C3's contract with Saddle Brook. (3/19 Tr. 120:5-18). In fact, D'Arminio testified that he was "taken aback" and "in shock" when he first learned about Ferriero and Carrino's agreement. (3/19 Tr. 121:12-14).

Based on D'Arminio's testimony, a rational juror could find that Ferriero conducted the affairs of the BCDO through a pattern of bribery with respect to the Borough of Saddle Brook. Mainly, a rational juror could find that Ferriero agreed to accept a benefit from Carrino in exchange

14

for his recommendation to Saddle Brook, and that he conducted the affairs of the BCDO by making a recommendation to Saddle Brook in accordance with the Agreement.

Last, in support of Racketeering Act #7A—Borough of Cliffside Park—the government called Councilwoman Donna Spoto and Borough Attorney Chris Diktas as witnesses, among others.  According to Diktas, Cliffside Park Mayor Gerald Calabrese invited him to a presentation where Carrino provided information on C3.  (3/20 Tr. 78:23-82:4).  After the presentation with Carrino, Ferriero called Diktas and recommended C3.  (3/20 Tr. 82:8-16).  Although Diktas testified that Ferriero was BCDO Chairman at the time of the call, Diktas stated that he "didn't reference either, was it a client, or the BCDO."  (3/20 Tr. 82:25-83:6).  Ferriero did not reveal, however, that he was acting as a consultant for C3, or that he stood to gain financially if Cliffside Park hired C3.  (3/20 Tr. 82:19-24).

Diktas went on to tell Spoto about Ferriero's recommendation.  (3/20 Tr. 84:9-16; 3/25 a.m. Tr. 73:18-23, 61:25-62:7).  According to Spoto, Diktas advised her that Ferriero and Carrino had a relationship; Spoto took Ferriero's call to Diktas to mean "Joe wanted it."  (3/25 a.m. Tr. 73:20-74:11).  Spoto was unaware of the financial relationship between Ferriero and Carrino, but understood that C3 was something that the Chairman wanted.  (3/25 a.m. Tr. 74:6-11).  Spoto also testified that Cliffside Park would at times consider the recommendation of the BCDO Chairman when evaluating a vendor.  (3/25 a.m. Tr. 74:12-16).

Based on the foregoing testimony, a rational juror could find that Ferriero conducted the affairs of the BCDO through a pattern of bribery with respect to the Borough of Cliffside Park.  In particular, a rational juror could find that Ferriero agreed to accept a benefit from Carrino in exchange for his recommendation to Cliffside Park, and that he conducted the affairs of the BCDO by making a recommendation to the Borough in accordance with the Agreement.

Accordingly, the Court concludes that the government sufficiently established a nexus for Racketeering Acts #3A, #4, #5, #6, and #7A, and declines to enter a judgment of acquittal as to Count One.

### 3. Bribery Predicates

Next, Ferriero questions the sufficiency of the evidence produced in support of the bribery predicates for Racketeering Acts #3A, #4, #5, #6, and #7A. (Def. 29(a) Mov. Br. at 10, 12, 13, 14, 16). Racketeering Acts #3A, #4, #5, #6, and #7A charged Ferriero with violation of the New Jersey Bribery Statute, N.J.S.A. 2C:27-2a., as sub-predicates for the Count One RICO violation. The pertinent provision of the New Jersey Bribery Statute provides as follows:

> 2C:27-2. Bribery in official and political matters
>
> A person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:
>
> a. Any benefit as consideration for a decision, opinion, recommendation, vote or exercise of discretion of a public servant, party official or voter on any public issue or in any public election . . . .

N.J.S.A. 2C:27-2a. As to the "benefit" that a person guilty of bribery gives or receives, the New Jersey Bribery Statute defines "benefit" as "gain or advantage, or anything regarded by the beneficiary as gain or advantage, including pecuniary benefit or a benefit to any other person or entity in whose welfare he is interested." N.J.S.A. 2C:27-1a. Additionally, "benefit as consideration" is defined as "any benefit not authorized by law." N.J.S.A. 2C:27-2. Furthermore, a "party official" is defined as "a person who holds an elective or appointive post in a political party in the United States by virtue of which he directs or conducts, or participates in directing or conducting party affairs at any level of responsibility." N.J.S.A. 2C:27-1e.

An agreement need not be reached in order to commit a violation of the New Jersey Bribery Statute. *United States v. Traitz*, 871 F.2d 368, 386 (3d Cir. 1989). Rather, if a defendant "meant

to confer a benefit as consideration for official action or accept a benefit for that purpose, the offense of bribery is complete." *Id.* (citing Model Penal Code § 240.1 comment 4(c) (1980) for its interpretation of the predecessor New Jersey Bribery Statute). In the alternative, the government may establish a bribery offense through proof of an agreement. *See State v. Livingston*, No. A-1170-12T3, 2014 WL 4546605, at *4 (N.J. Super. Ct. App. Div. Sept. 16, 2014) (addressing bribery under N.J.S.A. 2C:27–2c and stating that it "does not require that the benefit actually be accepted; mere agreement to accept a benefit is sufficient").

Here, Ferriero asserts that "the government presented no evidence whatsoever at trial supporting the allegation that Mr. Ferriero solicited and accepted a bribe from the Software Developer." (Def. 29(a) Mov. Br. at 10, 12, 13, 14, 16). In particular, Ferriero argues that the government failed to call the Software Developer, John Carrino, or any other witness with first-hand knowledge of the agreement between Ferriero and Carrino. (*Id.* at 10, 12, 13, 14-15, 16). Ferriero also asserts that "the government failed to adduce any evidence that Mr. Ferriero contacted any decisionmaker" regarding C3. (*Id.* at 10, 12, 13, 15, 16).

Ferriero's arguments are misplaced, and the Court concludes that any rational trier of fact could find that Ferriero violated the New Jersey Bribery Statute. During its case-in-chief, the government introduced the April 22, 2008 Agreement between SJC and Braveside. (GX 556). The Agreement memorializes the terms Ferriero and Carrino entered into during September 2007. (GX 556; 3/18 p.m. Tr. 22:16-23). In pertinent part, SJC agreed to "provide guidance, as required, for implementation of a coordinated and focused action plan necessary to promote local government support in connection with the aforementioned C3 product and any other related product or services." (GX 556; *see also* 3/18 p.m. Tr. 22:16-23). In exchange for the consulting services, Braveside would pay SJC "[a] professional fee of twenty-five percent (25%) gross

revenue generated from the sale of the aforementioned C3 product in accordance with the current C3 Licensing Fees for Municipalities and any other value added related C3 products, technologies, or services. . . . Said professional fee shall be paid within 10 days of receipt of payment from the C3 Client for the product or services that were supplied . . . ."  (GX 556).

The Agreement is more than sufficient to establish that Ferriero agreed to accept a pecuniary benefit from Carrino in exchange for Ferriero's consulting services.  Based on Ferriero's position as BCDO Chairman, a rational juror could infer that Ferriero agreed to recommend C3 as a party official.  Furthermore, testimony from McHale, Sarlo, and D'Arminio indicated that Ferriero recommended C3 in his capacity as Chairman of the BCDO.  (3/19 Tr. 100:5-7; 3/20 Tr. 39:4-6; 3/25 p.m. Tr. 15:7-10).  The government was not required to call Carrino or another witness with first-hand knowledge of the Agreement, especially when the foregoing evidence sufficiently establishes that Ferriero engaged in bribery in violation of N.J.S.A. 2C:27-2.

Along the same lines, the government was not required to adduce evidence establishing that Ferriero contacted decision-makers in the five municipalities, as the New Jersey Bribery Statute does not require the actual performance of a "decision, opinion, recommendation, vote or exercise of discretion."  N.J.S.A. 2C:27-2(a).  Rather, a person is guilty under the New Jersey Bribery Statute if he or she "solicits, accepts or agrees to accept" a benefit.  The bribery was complete once Ferriero agreed to accept a benefit as consideration for his recommendations.  *See Livingston*, 2014 WL 4546605, at *4.

Turning to Racketeering Act #3A, this Act alleges that Ferriero

committed an act involving bribery, that is, defendant FERRIERO solicited, accepted, and agreed to accept from the Software Developer a benefit, namely, a percentage share or kickback, of the gross revenues received by C3 from the Borough of Dumont, in exchange for (i) defendant FERRIERO's decision, opinions, recommendations, and exercises of discretion as a party official and (ii)

18

the decisions, opinions, recommendations, and exercises of discretion of public officials over whom defendant FERRIERO held apparent and actual influence

(Ind. at 52).

At trial, the government adduced sufficient evidence from which a rational juror could infer that Ferriero did in fact "solicit, accept, or agree to accept" a benefit from Carrino with respect to the Borough of Dumont. For example, in September 2007, Ferriero and Carrino agreed that Ferriero would provide consulting services for C3 in exchange for a percentage of the revenues received. (*See* GX 556). McHale testified that Ferriero recommended C3 to Dumont, and that he did so in his capacity as BCDO Chairman. (3/25 p.m. Tr. 10:14-16, 15:1-10). On September 29, 2007—presumably after he made the recommendation—Ferriero emailed McHale and asked "how are we doing with C-3." (GX 515). Accordingly, any rational trier of fact could infer that Ferriero agreed to accept a benefit from Carrino for Ferriero's recommendation to Dumont because Ferriero did in fact make such a recommendation to a Dumont official that was consistent with the description outlined in the Agreement.

Furthermore, the government introduced evidence establishing that Braveside paid SJC $4,125 on May 16, 2008 and $2,625 on September 18, 2008 with respect to Dumont. (3/18 p.m. Tr. 39:4-20, 41:19-25; GX 57 (detailing Braveside Capital's bank records)). Based on the documentary evidence and testimony, a rational juror could also infer that Ferriero accepted a benefit—a percentage of C3's revenues from the Dumont contract—in exchange for his recommendation as a party official. As such, the Court concludes that the government presented sufficient evidence from which a rational juror could conclude that Ferriero committed Racketeering Act #3A.

Racketeering Act #4 alleges that Ferriero

committed an act involving bribery, that is, defendant FERRIERO solicited, accepted, and agreed to accept from the Software Developer a benefit, namely, a

> percentage share or kickback, of the gross revenues received by C3 from the Township of Teaneck, in exchange for (i) defendant FERRIERO's decision, opinions, recommendations, and exercises of discretion as a party official and (ii) the decisions, opinions, recommendations, and exercises of discretion of public officials over whom defendant FERRIERO held apparent and actual influence

(Ind. at 55).

For the same reasons discussed with respect to Racketeering Act #3A, the Court concludes that the government presented sufficient evidence from which a rational juror could conclude that Ferriero did in fact "solicit, accept, or agree to accept" a benefit from Carrino.  On July 27, 2008, Braveside paid SJC $5,125 with respect to Teaneck.  (3/18 p.m. Tr. 40:11-41:6; GX 54).  Ferriero's assistant, Maria Fagliarone, testified that the check was deposited into Ferriero's account.  (3/18 pm. Tr. 41:13-14).  Accordingly, a rational juror could find that Ferriero accepted a benefit from Carrino in exchange for his recommendation to Teaneck as a party official.

Furthermore, there is circumstantial evidence from which a rational juror could infer that Ferriero committed Racketeering Act #4.  As discussed above in the Court's Nexus section, Ferriero marked the named "Rudy" next to Teaneck on the Bergen County Municipality Guide. (GX 504A).  Carrino sent Ferriero an email indicating that "the gentleman you met with that morning (Teaneck) got me in touch with the Teaneck BA, who I have scheduled for 2pm Monday." (GX 506). Subsequently, Carrino emailed El-natan Rudolph thanking him for putting Carrino "in touch with Ms. Fall in Teaneck," and indicating that they had a meeting on Monday.  (GX 509). Importantly, McHale testified that at some point in time Ferriero had taken Rudolph under his wing to shepherd Rudolph into the political world.  (3/25 p.m. Tr. 65:2-15).  A few months after Carrino's meeting with Ms. Fall, Rudolph presented a resolution to the Teaneck council to hire C3.  (GX 532).  The resolution was adopted and Rudolph voted in favor of hiring C3.  (GX 532). Thereafter, Carrino paid SJC $5,125 in connection with Teaneck.  (*See* GX 54 at 3 (check from Braveside to SJC listing "Q1: Teaneck Q2: Teaneck" in the memo line)).

Pursuant to the above evidence, a rational juror could infer that Ferriero agreed to accept a benefit from Carrino in exchange for his recommendation as BCDO Chairman.  In particular, a rational juror could infer that, as BCDO Chairman, Ferriero recommended C3 to Rudolph, someone with whom Ferriero had a political relationship, and that he did so in exchange for payment from Carrino.   As such, the Court concludes that the government presented sufficient evidence from which a rational juror could conclude that Ferriero committed Racketeering Act #4.

Racketeering Act #5 alleges that Ferriero

> committed an act involving bribery, that is, defendant FERRIERO solicited, accepted, and agreed to accept from the Software Developer a benefit, namely, a percentage share or kickback, of the gross revenues received by C3 from the Borough of Wood Ride, in exchange for (i) defendant FERRIERO's decision, opinions, recommendations, and exercises of discretion as a party official and (ii) the decisions, opinions, recommendations, and exercises of discretion of public officials over whom defendant FERRIERO held apparent and actual influence

(Ind. at 56).

With regard to the Borough of Wood-Ridge, Sarlo testified that Ferriero continued to recommend C3 from September 2007 onward.   (3/20 Tr. 35:17-24).   Ferriero continued to recommend C3 to Wood-Ridge and "pushed hard" for the Borough to hire C3 after he and Carrino entered into the terms of the Agreement.  (3/20 Tr. 35:17-24).   Furthermore, in the summer of 2008, Ferriero confronted Sarlo at a BCDO golf outing regarding Wood-Ridge's decision not to hire C3.  (3/20 Tr. 36:20-37:23).  Based on the foregoing, a rational juror could infer that Ferriero agreed to accept the benefit outlined in the Agreement in exchange for his recommendation as a party official.  Accordingly, the Court concludes that the government presented sufficient evidence from which a rational juror could conclude that Ferriero committed Racketeering Act #5.

Racketeering Act #6 alleges that Ferriero

> committed an act involving bribery, that is, defendant FERRIERO solicited, accepted, and agreed to accept from the Software Developer a benefit, namely, a

> percentage share or kickback, of the gross revenues received by C3 from the Township of Saddle Brook, in exchange for (i) defendant FERRIERO's decision, opinions, recommendations, and exercises of discretion as a party official and (ii) the decisions, opinions, recommendations, and exercises of discretion of public officials over whom defendant FERRIERO held apparent and actual influence

(Ind. at 57).

According to D'Arminio, Ferriero recommended C3 to Saddle Brook in his capacity as BCDO Chairman at the November 2007 League of Municipalities convention. (3/19 Tr. 98:5-100:7). As previously stated, the Agreement "memorialized the agreed upon terms . . . entered into as of September 2007 between Braveside . . . and SJC . . . ." (GX 556). Thus, a rational juror could infer that Ferriero agreed to accept the benefit outlined in the Agreement in exchange for his recommendation to Saddle Brook as a party official.

Furthermore, the government introduced evidence that Braveside paid SJC $2,625 in connection with Saddle Brook on September 18, 2008 and that Ferriero deposited the check. (GX 57 (9/18/2008 check from Braveside to SJC for $2,625 listing "Q3 Saddlebrook & Dumont" in the memo line); 3/18 p.m. Tr. 41:19-42:2). As such, a rational juror could infer that Ferriero accepted a benefit from Carrino—a percentage of C3's revenue from Saddle Brook—in exchange for his recommendation as a party official. Accordingly, the Court concludes that the government presented sufficient evidence from which a rational juror could conclude that Ferriero committed Racketeering Act #6.

Racketeering Act #7A alleges that Ferriero

> committed an act involving bribery, that is, defendant FERRIERO solicited, accepted, and agreed to accept from the Software Developer a benefit, namely, a percentage share or kickback, of the gross revenues received by C3 from the Borough of Cliffside Park, in exchange for (i) defendant FERRIERO's decision, opinions, recommendations, and exercises of discretion as a party official and (ii) the decisions, opinions, recommendations, and exercises of discretion of public officials over whom defendant FERRIERO held apparent and actual influence

(Ind. at 58).

For the same reasons discussed with respect to Racketeering Acts #3A, #4, #5, and #6, the Court concludes that a rational juror could conclude that Ferriero agreed to accept a benefit from Carrino in exchange for his recommendation to Cliffside Park as a party official. According to Diktas, Carrino gave a presentation of C3 to Cliffside Park in 2007 or 2008. (3/20 Tr. 79:1-15). Following the presentation, Ferriero called Diktas to recommend C3. (3/20 Tr. 82:8-21). Spoto testified that Diktas advised her about the relationship between Ferriero and Carrino. (3/25 a.m. Tr. 73:20-23). She also testified that on May 6, 2008, Cliffside Park passed a resolution to hire C3's services. (3/25 a.m. Tr. 75:15-78:8; *see also* GX 564). Based on the foregoing evidence and testimony, a rational juror could infer that Ferriero made the recommendation to Diktas following the September 2007 agreement with Carrino. Furthermore, a rational juror could infer that Ferriero agreed to accept the benefit outlined in the Agreement in exchange for his recommendation to Cliffside Park as a party official. As such, the Court concludes that the government presented sufficient evidence from which a rational juror could conclude that Ferriero committed Racketeering Act #7A.

Accordingly, Court denies Ferriero's motion for a judgment of acquittal as to Count One.

**B.     Count Three**

Count Three of the Indictment charged Ferriero with a Travel Act violation under 18 U.S.C. § 1952(a)(1), (3) and § 2. (Ind. at 66-67). Ferriero asserts that judgment of acquittal should be entered on Count Three. (Def. 29(a) Mov. Br. at 17). But, Ferriero does not present any argument as to Count Three. Accordingly, the Court denies Ferriero's request to enter a judgment of acquittal as to Count Three.

### C.     Count Five

Count Five of the Indictment charged Ferriero with wire fraud, in violation of 18 U.S.C. § 1343, based on a July 8, 2008 e-mail from Carrino to Cliffside Park officials.  (Ind. at 68).  The Indictment alleges that this e-mail identified Carrino "as sole member of C3 and intentionally fail[ed] to disclose defendant Ferriero's financial interest in C3's contract with the Borough of Cliffside Park."  (*Id.* at 69).

To prove wire fraud under 18 U.S.C. § 1343, the government must establish beyond a reasonable doubt: "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of . . . interstate wire communications in furtherance of the scheme."  *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010).  Although the wire fraud statute does not explicitly contain a materiality element, the Supreme Court has held that "materiality of falsehood" is an element of the statute.  *See Neder v. United States*, 527 U.S. 1, 25 (1999).

For purposes of the wire fraud statute, the scheme to defraud "can be in the form of an assertion of a material falsehood with the intent to deceive or active concealment of a material fact with the intent to deceive."  *United States v. Pasquantino*, 336 F.3d 321, 333 (4th Cir. 2003) (en banc), *aff'd*, 544 U.S. 349 (2005).  As the jury was instructed in this case, "deceitful statements of half truths or the concealment of material facts or the expression of an opinion not honestly entertained may constitute false or fraudulent statements.  The arrangement of the words, or the circumstances in which they are used may convey the false and deceptive appearance.  The deception need not be premised upon spoken or written words alone."  (Jury Instruction #16).  A false statement or omission is material if it has "a natural tendency to influence, or [is] capable of

influencing, the decision of the decisionmaking body to which it was addressed." *Neder*, 527 U.S. at 16 (internal quotation marks omitted).

In his brief in support of his Rule 29(a) motion for acquittal, Ferriero argues that he is entitled to a judgment of acquittal on Count Five. (Def. 29(a) Mov. Br. at 17-19). Ferriero does not specifically address why he is entitled to acquittal on this count, but rather claims that his "arguments regarding Racketeering Acts #3-7 apply equally" to Count Five. (*Id.* at 17 n.1). Having reviewed those arguments, the Court understands Ferriero to be asserting that the government failed to present any evidence of a material misrepresentation made by Ferriero, or on behalf of Ferriero, to any Cliffside Park decision-maker. (*See id.* at 17). The Court disagrees.

Contrary to Ferriero's contention, the government introduced sufficient evidence of a material misrepresentation by Carrino, which was made on Ferriero's behalf. The government introduced evidence that Cliffside Park officials grew concerned that Ferriero might be secretly profiting off of C3's contract with the Borough of Cliffside Park. (3/20 Tr. 128:24-130:25; 3/25 a.m. Tr. 78:9-79:15). Specifically, Councilwoman Spoto testified that, based on publicly available information, she became concerned that Ferriero had a financial interest in C3. (3/25 a.m. Tr. 78:9-15). She raised this concern with the mayor of Cliffside Park, who then asked Chief Financial Officer Frank Berardo to contact Carrino and ask him if there were any other partners in the company. (3/25 a.m. Tr. 78:13-20). At trial, Berardo confirmed that the mayor wanted to know who else was involved with C3 and asked him to contact Carrino. (3/20 Tr. 128:24-130:25). Berardo testified that he called Carrino and inquired about the company's ownership. (3/20 Tr. 130:9-13). In response to this request for information, Carrino sent an email to Berardo and attached only C3's certificate of incorporation, along with a copy of the proposed contract with the Borough of Cliffside Park. (3/20 Tr. 130:14-20; GX 574). These documents indicated that

Carrino was the sole owner of C3.  (*See* GX 574).   Carrino did not disclose that Ferriero would

receive twenty-five percent of the revenues from any contract with Cliffside Park.  Spoto testified

that Berardo reported back on Carrino's response and that, based on her conversation with Berardo,

her understanding was that there were no other partners in C3.  (3/25 a.m. Tr. 79:5-15).  She further

testified that she did not learn of Ferriero's financial interest in C3 until the government's

investigation and that she was "very surprised" since Cliffside Park had been told that were no

other partners in C3.  (3/25 a.m. Tr. 81:25-82:22).  Certainly, a rational juror could have inferred

that Spoto felt deceived by Carrino's nondisclosure.  Based on Berardo and Spoto's testimony and

the documentary evidence presented during the government's case-in-chief, a rational factfinder

could conclude that Carrino's nondisclosure constituted a material misrepresentation to Cliffside

Park decision-makers.  Accordingly, the Court denies Ferriero's Rule 29(a) motion for acquittal

with respect to Count Five.

## IV.    RULE 29(C) MOTION FOR JUDGMENT OF ACQUITTAL

### A.    Counts One and Three

Following the jury's verdict, Ferriero moved for judgment of acquittal on Counts One,

Three, and Five pursuant to Rule 29(c).  (D.E. No. 138, Brief in Support of Joseph Ferriero's Post-

Trial Motions ("Def. 29(c) Mov. Br.")).  With respect to Count One, Ferriero asserts that: (1) the

government failed to present sufficient evidence of the RICO nexus requirement, (*id.* at 5-23); (2)

the government failed to present sufficient evidence of the RICO pattern requirement, (*id.* at 24-

33); (3) the government failed to present sufficient evidence that there was an agreement to corrupt

the process, (*id.* at 41-42); and (4) there was insufficient evidence to satisfy the "public issue"

element of the New Jersey Bribery Statute, (*id.* at 38 n.5).  Additionally, Ferriero asserts that the

government's failure to present sufficient evidence of an agreement to corrupt the process, along

with its failure to satisfy the "public issue" element, warrants a judgment of acquittal on Count

Three.  (*Id.* at 38-40).  As noted above, Count Three charged Ferriero with a Travel Act violation premised on a violation of the New Jersey Bribery Statute.

### 1. RICO Nexus Requirement

As previously noted, to establish the requisite nexus under 18 U.S.C. § 1962(c), the government must demonstrate that the defendant participated in the conduct of the enterprise's affairs "through—that is, by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of—a pattern of racketeering activity."  *Ins. Brokerage*, 618 F.3d at 372 (internal quotation marks omitted).  In that light, Ferriero asserts that the government failed to present sufficient evidence of the RICO nexus requirement.  More specifically, Ferriero contends that when "the RICO enterprise is a legitimate entity, the nexus requirement necessitates evidence of a very specific relationship."[3] (Def. 29(c) Mov. Br. at 5).  Furthermore, Ferriero asserts that, "[a]t most, the government presented evidence that Mr. Ferriero held a high-ranking position in the BCDO during the relevant time period and that certain non-decision makers were aware of that position."  (*Id.* at 6-7).

During his defense, Ferriero called nine witnesses, including John Carrino.  According to Carrino, the business relationship he had with Ferriero had nothing to do with Ferriero's position as BCDO Chairman.  (4/1 a.m. Tr. 49:19-22).  Carrino testified that he was not paying Ferriero for his influence and recommendations as BCDO Chairman.  (3/31 Tr. 181:15-20).  Indeed, Carrino indicated that Ferriero helped market C3 in other New Jersey counties outside of Bergen County. (4/1 a.m. Tr. 39:2-40:12). Furthermore, Carrino stated that he never had a meeting with Ferriero regarding C3 at the BCDO's headquarters, that Ferriero never conducted the affairs of his business

---

[3]  Ferriero cites no authority, nor can the Court locate any authority, to support this proposition. Accordingly, the Court will disregard this argument.

from the BCDO offices, nor did Carrino see Ferriero conducting business activities relating to C3 at the BCDO offices.  (4/1 a.m. Tr. 101:13-102:5).

On cross-examination, however, Carrino provided testimony from which a rational juror could conclude that Ferriero provided recommendations in his capacity as BCDO Chairman. According to Carrino's cross-examination testimony, he paid Ferriero "to make introductions and follow up, recommend C3."  (4/2 a.m. Tr. 26:22-23).   Carrino testified that Ferriero introduced him to at least one Democratic municipal official—D'Arminio, Democratic Mayor of Saddle Brook—at the League of Municipalities convention in November of 2007.  (4/1 p.m. Tr. 49:12-50:1).  Carrino could not, however, remember whether it was a BCDO event.  (4/1 p.m. Tr. 49:18-22).   Prior to November 2007, Carrino gave a C3 presentation to Saddle Brook, but did not secure a contract.  (4/1 p.m. Tr. 50:13-51:2).   However, Carrino testified that he did not secure a contract with Saddle Brook until Ferriero recommended C3 to D'Arminio at the League of Municipalities convention.  (4/1 p.m. Tr. 51:3-9).  In addition, Carrino testified that Ferriero recommended C3 to Jim Carroll, a Bergen County Freeholder, at a BCDO-sponsored boat ride.  (4/1 p.m. Tr. 54:10-55:23).

Carrino also testified as to the updates he provided Ferriero regarding C3's progress in various municipalities.  With respect to the borough of Oradell, Carrino told Ferriero that "they want to move very quick, one week, so as soon as you touchdown in NJ, that might need to be one of your first calls."  (GX 536 (December 30, 2007 email from Carrino to Ferriero); 4/1 p.m. Tr. 56:6-16).  Carrino testified that he was not looking for an introduction to Oradell, but rather, an intervention.  (4/1 p.m. Tr. 56:20-22).  With respect to Lyndhurst, Carrino told Ferriero that the "mayor absolutely loves C3 and wants it, but is going to need you to solidify."  (GX 536; 4/1 p.m. Tr. 56:23-57:4).  Carrino testified that he needed Ferriero to "vouch for" C3, to "say it's a good

28

product," and that he did not need an introduction in Lyndhurst because he had already meet with the mayor. (4/1 p.m. Tr. 57:1-9). With respect to Hillsdale, Carrino told Ferriero "[n]ew regime, not sure how to move forward." (GX 536). On cross-examination, Carrino indicated that new regime means when "somebody else is coming in," such as when the Democrats lose and the Republicans take office. (4/1 p.m. Tr. 58:23-59:11). According to Carrino, when the Democrats lost and there was a new regime, he was unsure how to move forward, unless he had a relationship with the new regime. (4/1 p.m. Tr. 59:12-14).

Viewing Carrino's testimony as a whole, in the light most favorable to the government, it is possible for a rational juror to infer that Ferriero utilized his influence and power as BCDO chairman to provide recommendations on behalf of C3. Indeed, the Court must "not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Flores*, 454 F.3d at 154 (quoting *Brodie*, 403 F.3d at 133) (internal quotation marks omitted). Instead, all credibility issues must be resolved in the government's favor. *Scanzello*, 832 F.2d at 21. Carrino testified, and the evidence shows, that Carrino paid Ferriero to make recommendations, and that he needed Ferriero to make calls, "solidify," and "vouch for" C3—even with respect to municipalities where Carrino already had been introduced. Furthermore, Ferriero made recommendations and introductions at political events. Defendant's case was not sufficient enough to overcome the nexus established by the government's case-in-chief, as outlined above. Accordingly, the Court concludes that Ferriero has failed to meet his burden of challenging the sufficiency of the evidence presented at trial, and that a rational trier of fact could find that the government sufficiently established the RICO nexus requirement.

### 2. RICO Pattern Requirement

Next, Ferriero asserts that the government failed to present sufficient evidence of the RICO pattern requirement.  To establish the pattern element of a RICO offense, the government must prove that Ferriero committed "at least two acts of racketeering activity."   18 U.S.C. § 1961(5).  Moreover, "a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

According to Ferriero, the government failed to establish a pattern of racketeering activity because it failed to: (1) sufficiently prove that Ferriero committed two racketeering acts, (Def. 29(c) Mov. Br. at 26); (2) establish a threat of continuing racketeering activity, (*id.* at 27); and (3) present sufficient evidence that the bribery allegations were the regular way of conducting the affairs of the BCDO, (*id.* at 32).  The Court will address each argument in turn.

First, Ferriero asserts that the government failed to establish a pattern of racketeering activity because it did not sufficiently prove that Ferriero committed two racketeering acts.  For Racketeering Acts #3A, #4, #5, #6, and #7A, the jury found Ferriero guilty of bribery in violation of N.J.S.A. 2C:27-2a.  However, according to Ferriero, the government only proved one instance of bribery, at best, because the government relied upon the Agreement between Ferriero and Carrino.  (*Id.* at 24, 26).

The Court finds this argument to be unpersuasive.  The Third Circuit and its sister circuits have rejected similar theories and instead held that multiple payments can constitute separate offenses.  For instance, in *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, the plaintiff alleged that the defendant engaged in bribery, mail and wire fraud, and corrupt practices in violation of civil RICO.  847 F.2d 1052, 1063 (3d Cir. 1988).  In support of its bribery allegations, the plaintiff

alleged that the defendant was part of a complex scheme where one European conglomerate and two American corporations influenced a foreign country's process for awarding contracts. *Id.* The defendant was paid four times in furtherance of this arrangement. *Id.* at 1055. The Third Circuit stated "illegal conduct that constitute[s] a single, completed criminal episode [is] in some circumstances sufficient to describe a pattern of racketeering activity." *Id.* at 1063. The circumstances to consider are "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Id.*

In *United States v. Alaimo*, the government charged the defendant with thirty-four violations of the Taft-Hartley Act for his bi-monthly receipt of payments from a coal company. 297 F.2d 604, 605 (3d Cir. 1961). According to the government, the payments were made to the defendant as a representative of the company's employees, not for his services as an employee on the payroll. *Id.* The defendant contended that he did not commit thirty-four violations, and that the government should have elected one of the thirty-four payments as the basis for the violation. *Id.* The Third Circuit concluded, however, that "the [g]overnment's case was sound and that each unlawful payment to the defendant constituted a separate offense." *Id.* at 606; *see also United States v. Zauber*, 857 F.2d 137, 148 (3d Cir. 1988) ("Each violation of § 1954 constitutes a separate act of racketeering activity."); *Forbes v. Eagleson*, No. 95-7021, 1996 WL 420829, at *2 (E.D. Pa. July 23, 1996) ("It is well established that each delivery or receipt of a 'thing of value' can constitute a separate . . . violation and a separate RICO predicate act, even when the payment is part of one continuous, previously devised bribery scheme.").

Furthermore, the Third Circuit and district courts within the Circuit have routinely found multiple bribery violations—for the purpose of fashioning an appropriate sentence under the

31

Federal Sentencing Guidelines—where the defendant agreed to influence a single action. *See United States v. Weaver*, 175 F. App'x 506, 511 (3d Cir. 2006) ("Given these three factual conclusions—that the bribes increased over time, that the payments varied in amount and delivery method, and that Weaver performed multiple acts—we conclude that Weaver accepted multiple bribes under Guideline § 2C1.1."); *Vidal v. United States*, No. 05-988, 2006 WL 2465417, at *6 (D.N.J. Aug. 22, 2006) (holding that two related payments did not "bear the hallmarks of installment payments" and were not a single bribe because they "were two years apart, varied in amount, and were made to influence separate actions").

Here, the Court concludes that the government established multiple violations of the New Jersey Bribery Statute. Although Ferriero memorialized his agreement with Carrino in the April 22, 2008 Agreement, each payment Ferriero accepted from Carrino was a separate bribery violation. The payments were not made as installments to the overall Agreement. Rather, Ferriero was only paid if C3 secured a contract with a particular township or borough. Furthermore, the payments varied in amount and were made at various times—demonstrating that the payments were not simply installments to the overall Agreement. (*See* GX 557).

Moreover, as the government notes, Ferriero was charged with soliciting and agreeing to accept kickbacks from Carrino. (*See* D.E. No. 163, Memorandum of the United States in Response to Defendant's Post-Trial Motions ("Govt. 29(c) Opp. Br.") at 34, 36). Both the solicitation (*i.e.*, each individual agreement to recommend C3 to different municipalities) and Ferriero's acceptance of payment Carrino constitute a violation of the New Jersey Bribery Statute. Indeed, Ferriero did not receive a payment from Carrino in connection with Racketeering Act #5, Wood-Ridge, because Wood-Ridge did not sign a contract with C3. However, the government did produce evidence from which a rational trier of fact could infer that Ferriero agreed to recommend C3 to Wood-

Ridge in exchange for a kick, and the jury did in fact found Ferriero guilty of committing Racketeering Act #5. Accordingly, the Court concludes that the government produced sufficient evidence to establish at least two racketeering acts.

Ferriero also asserts that the Court should enter a judgment of acquittal as to Count One because the government failed to present sufficient evidence of a threat of continued racketeering activity. (Def. 29(c) Mov. Br. at 27). To establish a pattern of racketeering activity under RICO, "a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239.

A threat of continued criminal activity—also known as continuity—can be established by closed-ended continuity or open-ended continuity. *Id.* Closed-ended continuity refers to "proving a series of related predicates over a substantial period of time," whereas open-ended continuity refers to "past conduct that by its nature projects into the future with a threat of repetition." *Id.* Whether the racketeering acts pose "a threat of continued racketeering activity depends on the specific facts of each case." *Id.* at 241. The government need not, however, prove both closed-ended and open-ended continuity. *See, e.g.*, *United States v. Pelullo*, 964 F.2d 193, 208 (3d Cir. 1992) (holding that plaintiff established a threat of continuing racketeering where plaintiff only established closed-ended continuity).

Here, the Court concludes that the government presented sufficient evidence to establish open-ended continuity. To establish open-ended continuity, the government must demonstrate that the racketeering acts pose a "specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity." *H.J. Inc.*, 492 U.S. at 242. Alternatively, "[t]he continuity requirement is . . . satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business." *Id.* at 243.

At trial, the government produced substantial evidence from which a rational juror could conclude that Ferriero's actions posed a threat of extending indefinitely into the future.  For example, the government introduced the Bergen County Municipality Guide that was marked up in Ferriero's handwriting.  (GX 504A).  On the Guide, Ferriero wrote the names of Democratic officials, whereas the majority of the Republican municipalities were marked with an X or left unmarked.  (GX 504A).  Furthermore, Carrino testified that he and Ferriero discussed marketing C3 outside of Bergen County.  (3/31 Tr. 174:6-12).  Moreover, the Agreement did not have an expiration date, and Carrino continued to pay Ferriero up until he was indicted in September 2008.  (*See* GX 57); *see also Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 253 (D.N.J. 2000) (finding open-ended continuity where the alleged criminal activity ceased only upon discovery).

Given the evidence that Ferriero marked the Guide with the names of numerous Democratic officials in Bergen County, that Carrino wanted to expand C3, and that the racketeering activity only ceased after Ferriero's 2008 indictment, a rational juror could conclude that Ferriero's racketeering activity posed a "specific threat of repetition extending indefinitely into the future."  *See H.J. Inc.*, 492 U.S. at 242.  Accordingly, the Court concludes that the government sufficiently established open-ended continuity.

Last, Ferriero asserts that the government failed to establish a pattern of racketeering activity because it did not present sufficient evidence that the bribery allegations were the regular way of conducting the affairs of the BCDO. (Def. 29(c) Mov. Br. at 32).  According to Ferriero, "the continuity requirement operates differently in cases involving a legitimate enterprise . . . as opposed to an 'association in fact' enterprise (the Genovese crime family)." (*Id.*).  Ferriero does not cite to, nor can the Court locate, any authority supporting his position that the government was

required to prove that the alleged racketeering activity is the "regular way of conducting business" for a legitimate entity.  As stated above, this is merely one way of establishing continuity.  Given that the government sufficiently established open-ended continuity, Ferriero's argument that the government did not establish the regular way of conducting the affairs of the BCDO is moot.  Accordingly, the Court concludes that the government sufficiently established a pattern of racketeering activity.

### 3. An Agreement to Corrupt the Process

Ferriero contends that he is entitled to a judgment of acquittal on Counts One and Three on the grounds that the government failed to produce sufficient evidence that he possessed the apparent or actual ability to influence Bergen County municipal officials.  (Def. 29(c) Mov. Br. at 41-42).  Furthermore, Ferriero asserts that the government failed to present sufficient evidence that he "agreed to engage in conduct that would 'corrupt the activities' of the governing bodies of the various municipalities, or that he in fact engaged in any such conduct."  (*Id.* at 42).

To support his argument, Ferriero relies on *United States v. Dansker*, where the Third Circuit reversed a Travel Act conviction that was premised on a violation of the New Jersey Bribery Statute.  537 F.2d 40 (3d Cir. 1976).  However, *Dansker* is distinguishable from the instant case.  In *Dansker,* the record showed that the vice chairman of a city parking authority (*i.e.*, a public official) withheld his opposition to a commercial development project under review by a local zoning board in exchange for money from a private developer.  *Id.* at 45.  Although the defendant was a public official, the action for which he was paid was unrelated to his position as vice chairman of the city parking authority.  In fact, the Third Circuit noted that it was "not even clear that the developers were aware of the fact that [the defendant] was the vice-chairman of the Fort Lee Parking Authority."  *Id.* at 50.  Rather, the evidence showed that the defendant was paid

for withholding opposition, as a member of the general public, to a project pending before a different entity, namely the Fort Lee Board of Adjustment.  *Id.*  The Third Circuit pointed out that "an examination of the record fails to disclose any evidence suggesting that [the defendant] had any access to the Board of Adjustment in some unofficial capacity which the developers were interested in purchasing."  *Id.*

Ultimately, the Third Circuit reversed the defendant's conviction on the ground that the government failed to show that he had any actual or apparent influence over official decisions concerning the commercial development project, or that the alleged bribers believed the defendant possessed such influence.  *Id.* at 49.  In reaching this decision, the *Dansker* Court explained that, "in order to establish a violation of the [predecessor bribery] statute, it must be demonstrated: (a) that the alleged recipient, whether he be a public official or not, possessed at least the apparent ability to influence the particular public action involved; and (b) that he agreed to exert that influence in a manner which would undermine the integrity of that public action."  *Id.*

By contrast, in this case, there was sufficient evidence that Ferriero possessed both the apparent and actual ability to influence Democratic, Bergen County municipal officials.  As noted above, several officials testified to the fact that Ferriero routinely provided them with recommendations in his capacity as BCDO Chairman regarding such subjects as which vendors to hire.  (*See, e.g.*, 3/19 Tr. 87-88, 122-123; 3/20 Tr. 29:10-23; 3/25 Tr. 74).  Indeed, officials testified that they valued his recommendations and took them seriously.  (*See, e.g.*, 3/19 Tr. 122:16-18; 3/25 a.m. Tr. 74:12-16, 135:20-136:15).  McHale also testified that Ferriero had a history of taking younger people involved in politics under his wing.  (3/25 p.m. Tr. 64:17-22, 65:5-66:1).  Carrino knew of Ferriero's influence and encouraged him to use his position "to make introductions and follow up, recommend C3."  (4/2 a.m. Tr. 26:22-23).  Moreover, there are many situations where

Carrino did not need an introduction, but rather needed Ferriero to "solidify" and "vouch for" C3 in Bergen County municipalities.  (*See* 4/1 p.m. Tr. 47:6-16; 49:4-7; 50:13-16; 56:13-22, 57:1-12; 60:5-7; 75:23-76:4; GX 536); *cf. United States v. Bencivengo*, 749 F.3d 205, 214 n.7 (3d Cir. 2014) (rejecting the defendant's reliance on *Dansker* and holding that it was "clear that [the briber] at least believed that [the defendant] had influence over the School Board, and there is no question that she knew [he] was the Mayor").  Thus, based on the evidence presented at trial, a rational juror could find that Ferriero possessed the apparent and actual ability to influence Democratic Bergen County officials.

Furthermore, the government presented sufficient evidence that Ferriero agreed to "exert [his] influence in a manner which would undermine the integrity of [a] public action."  *See Dansker*, 537 F.3d at 49.  The evidence presented at trial demonstrated that Ferriero secretly accepted payments from Carrino in exchange for his opinions, decisions, and recommendations as the BCDO Chairman and that he provided these decisions, opinions, and recommendations to Democratic municipal officials without revealing that he would financially benefit from any contract that C3 gained in the process.  For example, the government presented evidence that Ferriero and Carrino set up two layers of insulation between themselves to facilitate their bribery agreement.  (GX 556).  C3 paid Braveside, which then paid SJC, which then paid Ferriero.  (GX 557, 3/18 p.m. Tr. 39:4-20, 41:13-14, Tr. 41:19-42:2).  Furthermore, at trial, witnesses testified that they never heard of SJC before the government began investigating the company and that they were not aware of Ferriero's financial interest in C3.  (*See, e.g.*, 3/19 Tr. 120:5-18; 3/20 Tr. 33:16-22; 3/25 a.m. Tr. 82:16-22; 3/25 p.m. Tr. 30:7-20).  From this concealment evidence, a rational factfinder could find that Ferriero agreed to exert his influence to corrupt the process.  *Cf. Bencivengo*, 749 F.3d at 208, 214 & n.7 (affirming Travel Act conviction of defendant who

accepted secret payments in exchange for agreeing to influence award of contracts by school board).  Accordingly, the Court concludes that Ferriero is not entitled to a judgment of acquittal on Count One on this ground.  For the same reasons, the Court concludes that Ferriero is not entitled to acquittal on Count Three based on this challenge.

### 4. New Jersey Bribery Statute "Public Issue" Element

Ferriero also argues that he is entitled to a judgment of acquittal on Counts One and Three because the government failed to present sufficient evidence to satisfy the "public issue" requirement of the New Jersey Bribery Statute.  In seeking a judgment of acquittal on this ground, Ferriero lodges arguments that are improperly before the Court and have no bearing on the sufficiency of the evidence presented at trial.  First, he argues that there is a lack of clarity in the meaning of the term "public issue" and that this "further demonstrates the [New Jersey Bribery] statute's unconstitutional vagueness."  (Def. 29(c) Mov. Br. at 39).  Ferriero challenged the New Jersey Bribery Statute's vagueness in the context of his pretrial motion to dismiss, and the Court carefully considered his challenge and held that the statute is not unconstitutionally vague as applied to him.  At this stage, the Court will not entertain Ferriero's renewed arguments about the constitutionality of the New Jersey Bribery Statute.  (*See* D.E. No. 35, January 15, 2015 Opinion (denying Ferriero's motion challenging the constitutionality of the New Jersey Bribery Statute)).

Second, Ferriero argues that the jury instructions delivered in this case did not provide the "jury any guidance as to what does and does not qualify as a 'public issue'" and that the "jury was essentially left to their own devices about whether Mr. Ferriero's work on C3 concerned or was related to a 'public issue.'"  (Def. 29(c) Mov. Br. at 39).  Ferriero's argument is essentially a belated attack on the same jury instructions that he agreed to use.  The Court provided defense counsel ample opportunity to raise objections to the parties' joint proposed jury instructions and

request specific language.  But, a review of the record indicates that defense counsel did not object to the proposed instruction with respect to a "public issue."  Accordingly, the Court views defense counsel's failure to object to the "public issue" instruction as a waiver of the argument that it was insufficient.

To the extent that Ferriero challenges the sufficiency of the evidence to satisfy the "public issue" element of Counts One and Three, there was sufficient evidence from which a rational juror could find that Ferriero accepted bribes from Carrino in connection with a "public issue."  As the government correctly points out, the municipal contracts at issue in this case were clearly matters of public issue.  (Govt. 29(c) Opp. Br. at 51). C3 was retained by vote of each municipal council, which occurred at a public meeting.  (GX 565 (Cliffside Park); GX 530, 533 (Saddle Brook); GX 532 (Teaneck); GX 544, 545 (Dumont)).  Furthermore, the votes were recorded in official public minutes and resolutions.  (GX 566 (Cliffside Park); GX 530, 533 (Saddle Brook); GX 532 (Teaneck); GXs 544, 545 (Dumont)).  Additionally, the municipal contracts with C3 were public contracts, and C3 was paid with public funds.  Based on this extensive evidence, a rational juror could find that Ferriero accepted payments in connection with a "public issue."  Accordingly, the Court concludes that Ferriero is not entitled to a judgment of acquittal on Counts One and Three.

### B.    Count Five

Ferriero moves for a judgment of acquittal on Count Five.  He once again argues that there was insufficient evidence of a material misrepresentation made by Ferriero, or on behalf of Ferriero, to any Cliffside Park decision-maker.  (Def. 29(c) Mov. Br. at 37; D.E. No. 164, Reply Brief in Support of Joseph Ferriero's Post-Trial Motions Pursuant to Federal Rules of Criminal Procedure 29 and 33 ("Def. 29(c) Reply Br.") at 18-19).[4]  Additionally, he argues that there was

---

[4] Ferriero mistakenly asserts in his Rule 29(c) moving brief that he is entitled to a judgment of acquittal because there was no evidence of a material misrepresentation to a Dumont decision-maker.  (Def. 29(c)

no evidence that the July 9, 2008 e-mail from Carrino to Cliffside Park Chief Financial Officer Berardo was transmitted in interstate commerce.  (Def. 29(c) Mov. Br. at 34-37).  Finally, Ferriero argues in a footnote that the fact that the jury acquitted him on Count Two and did not reach a unanimous decision for Racketeering Act #7D further demonstrates that he is entitled to a judgment of acquittal or a new trial on Count Five.  (*Id.* at 37 n.4).

Ferriero's first argument is unavailing.  The government introduced sufficient evidence at the close of its case-in-chief from which a rational juror could find that the July 9, 2008 e-mail contained a material misrepresentation.  Moreover, during Ferriero's defense, Carrino testified that he spoke with Ferriero regarding how to respond to Berardo's request for information. (4/1 p.m. Tr. 108:19-110:11; 4/2 a.m. Tr. 3:11-4:18).  Additionally, Carrino was aware at the time that Ferriero was having legal issues regarding his alleged secret ownership in GGC.  (4/1 p.m. Tr. 105:18-23).  This testimony could suggests that Carrino was aware of the necessity to hide Ferriero's agreement to receive a share of C3's profits.  Accordingly, a rational juror could find that Carrino's nondisclosure of Ferriero's financial interest in C3 constituted a material misrepresentation to Cliffside Park decision-makers.

Next, the Court addresses Ferriero's argument that there was insufficient evidence that Carrino's e-mail was transmitted in interstate commerce.  The e-mail at issue was sent by Carrino from his jcarrino@xquizit.com address to Berardo at his fberardo@cliffsideparknj.gov address and to Diktas at an unknown e-mail address.  (GX 574).  Ferriero contends that there is nothing in Government Exhibit 574 indicating that the e-mail left New Jersey, there was no testimony that Carrino, Berardo, or Diktas were outside of New Jersey on July 9, 2008, and there was no

---

Mov. Br. at 37).  However, it is clear from Ferriero's reply brief that his challenge is appropriately directed at whether there was a material misrepresentation to a Cliffside Park official.  (Def. 29(c) Reply Br. at 18-19).

testimony regarding either the e-mail hosting system used by the Borough of Cliffside Park for the cliffsideparknj.gov domain or the location of the email servers hosting jcarrino@xquizit.com. (Def. 29(c) Mov. Br. at 35-36).

As noted above, 18 U.S.C. § 1343 provides that:

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, *transmits or causes to be transmitted by means of wire,* radio, or television *communication in interstate or foreign commerce,* any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343 (emphasis added).

Contrary to Ferriero's contention, the government was not required to make an affirmative showing that the July 9, 2008 e-mail actually crossed state lines. Rather, it was sufficient for the government to present evidence that Carrino's July 9, 2008 communication was sent and received over the Internet. Jury Instruction #16, to which Ferriero never objected, provides that "[t]he use of the Internet to send a message, such as an e-mail, or to communicate with a website may constitute a wire transmission in interstate commerce." This jury instruction is drawn from the Third Circuit Model Criminal Jury Instructions and *United States v. MacEwan*, 445 F.3d 237, 244 (3d Cir. 2006).

The Third Circuit in *MacEwan* held that use of the Internet fulfills the interstate commerce element of 18 U.S.C. § 2252A(a)(2)(B), the federal statute criminalizing receipt of child pornography. *Id.* at 246. In reaching this conclusion, *MacEwan* described the Internet as "a system that is inexorably intertwined with interstate commerce" and made clear that, "because of the very interstate nature of the Internet, once a user submits a connection request to a website server or an image is transmitted from the website server back to user, the data has traveled in interstate

41

commerce" regardless of the actual route taken. *Id.* at 244-45; *accord United States v. Hilton*, 257 F.3d 50, 54 (1st Cir. 2001) ("[P]roof of transmission of pornography over the Internet . . . satisfies the interstate commerce element of the offense."); *United States v. Carroll*, 105 F.3d 740, 742 (1st Cir. 1997) ("Transmission of photographs by means of the Internet is tantamount to moving photographs across state lines and thus constitutes transportation in interstate commerce."); *see also United States v. Pomerico*, No. 06-113, 2008 WL 4469465, at *3 (E.D.N.Y. Oct. 30, 2008) (quoting *MacEwan* and holding that "use of the Internet satisfies the interstate commerce element of [the child pornography statute], 18 U.S.C. § 2252A(a)(2)(B)" (internal quotation marks omitted)). Since *MacEwan*, the Third Circuit has reaffirmed that use of the Internet to send an image satisfies the interstate commerce element of 18 U.S.C. § 2252 and that an "affirmative showing that an image was transmitted across state lines" is not required. *United States v. Schade*, 318 F. App'x 91, 95 (3d Cir. 2009).

Congress did not expressly indicate that the term "interstate commerce" is to receive a different definition for 18 U.S.C. § 2252A as compared to the wire fraud statute. The Third Circuit's definition of "interstate commerce," as well as its broad holding that the Internet is "a system that is inexorably intertwined with interstate commerce," applies with equal force to the wire fraud context. *See United States v. Fumo*, No. 06-319, 2009 WL 1688482, at *9 (E.D. Pa. June 17, 2009) (holding *MacEwan*'s definition of "interstate commerce" to be binding precedent in the context of Rule 29 challenge to wire fraud conviction and holding that "it is legally sufficient for purposes of the 'interstate commerce' requirement that the e-mails at issue were sent and received through the Internet"). Thus, the Court concludes that the government satisfied the interstate commerce requirement of the wire fraud statute by presenting evidence that Carrino's July 9, 2008 communication was sent and received through the Internet. Because this evidence

was sufficient to satisfy the interstate commerce requirement, the Court does not address the parties' arguments regarding the import of the additional evidence presented at trial.

Finally, the Court considers Ferriero's argument that he is entitled to a judgment of acquittal on Count Five in light of the jury verdicts on Count Two and Racketeering Act #7D.  It is of no moment that the jury acquitted Ferriero of Count Two, which charged him with conspiring with Carrino to violate the Travel Act and commit mail and wire fraud, and could not reach a unanimous decision on Racketeering Act #7D, which involved the same July 9, 2008 e-mail.  It is well-settled that a defendant cannot challenge a conviction on one count based on the argument that the conviction is inconsistent with acquittal on another count.  *See United States v. Powell*, 469 U.S. 57, 66 (1984) (rejecting "as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them"); *see also Dunn v. United States*, 284 U.S. 390, 393 (1932).  Furthermore, the Court does not consider the jury verdicts to be inconsistent, given that Racketeering Acts #7D and Count Two required the jury to make additional findings not required for Count Five.  For Racketeering Act #7D, the jury was also required to find that the remaining racketeering elements were satisfied, and, for Count Two, the jury was also required to find that a conspiracy existed.  Notably, there was no need for the jury to reach a unanimous decision as to Racketeering Act #7D, given that it had already found Racketeering Act #7 to have been committed through violation of the New Jersey Bribery Statute.  For all these reasons, the Court rejects Ferriero's argument that he is entitled to a judgment of acquittal on Count Five based on the jury verdicts on other counts.

## V.    RULE 33 MOTION FOR A NEW TRIAL

### A.    Prejudicial Spillover

Ferriero argues that the Court should grant the motion for a new trial "because the submission [of] Racketeering Acts # 1 and # 2 to the jury, despite Mr. Ferriero's Rule 29 motion at the close of the government's case, created spillover which prejudiced the jury to the remaining Counts and Racketeering Acts."  (Def. 29(c) Mov. Br. at 43).   A "prejudicial spillover," or retroactive misjoinder, argument requires a two part inquiry.  First, the court must consider "whether the jury heard evidence that would have been inadmissible at a trial limited to the remaining valid count (*i.e.*, 'spillover' evidence)." *United States v. Cross*, 308 F.3d 308, 317 (3d Cir. 2002).  Or, "[i]n other words, if, in creating a hypothetical trial as to the valid count only, the evidence of the invalidated count would have been admissible anyway, the analysis ends there." *United States v. Lee*, 612 F.3d 170, 180 (3d Cir. 2010) (citation omitted).  If the evidence would have been inadmissible, the court must consider "whether it was prejudicial (*i.e.*, whether it affected adversely the verdict on the remaining count)." *Cross*, 308 F.3d at 317.

Here, Ferriero has not met his burden of demonstrating that the evidence introduced regarding Racketeering Acts #1 (GGC Scheme) and #2 (Xanadu Scheme) would have been inadmissible.[5]  Indeed, evidence of uncharged acts may be introduced to establish elements of the charged RICO offense.   *See United States v. DiSalvo*, 34 F.3d 1204, 1221 (3d Cir. 1994) (upholding introduction of evidence to establish the defendant's knowledge of the structure of the enterprise for purposes of RICO violation); *United States v. Eufrasio*, 935 F.2d 553, 572-73 (3d Cir. 1991) ("Evidence of uncharged crimes may be introduced even against a defendant without

---

[5] In fact, Ferriero failed to address the Third Circuit's two prong analysis for a spillover prejudice argument. (*See* Def. 29(c) Mov. Br. at 43-47; Govt 29(c) Opp. Br. at 56).  Moreover, Ferriero failed to address the two-prong analysis in his Reply Brief, and instead completely omitted the spillover prejudice argument. (*See* Def. 29(c) Reply Br.).

knowledge of such crimes, if the uncharged crimes are proof of some elements of the [RICO] crimes actually charged against such defendant."); *United States v. Traitz*, 871 F.2d 368, 389 (3d Cir. 1989) (upholding introduction of uncharged violence in RICO case).

Moreover, the lack of prejudice is evident given the jury's inability to reach a unanimous verdict on Racketeering Acts #1 and #2 and guilty verdict on Racketeering Acts #3A, #4, #5, #6, and #7A.  (*See* Govt 29(c) Opp. Br. at 55-56); *see United States v. Hamilton*, 334 F.3d 170, 183 (2d Cir. 2003) (citations omitted) ("The absence of such spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others.").  "[W]here the record indicates that the jury was able to distinguish between counts or between defendants, and to assess separately the evidence pertinent to each, we have found no basis for concluding that a new trial was warranted because of prejudicial spillover." *Hamilton*, 334 F.3d at 183.  Clearly, the jury was able to distinguish between government's evidence offered in support of each Racketeering Acts.

As such, the Court concludes that Ferriero has failed to establish spillover prejudice, and denies his motion for a new trial.  *See Hamilton*, 334 F.3d at 183 ("[N]o case has held that a defendant was entitled, on the ground of retroactive misjoinder, to a new trial on the counts of conviction simply because the jury found the government's proof on other counts unpersuasive.").

### B.    Insufficient Evidence

Lastly, Ferriero asserts that a new trial is warranted given the insufficiency of the evidence introduced in support of Counts One, Three, and Five.  (Def. 29(c) Mov. Br. at 3 n.1).   Ferriero moves for a new trial pursuant to Rule 33 based upon the same arguments used in support of his Rule 29(c) motion.  (*Id.*).   For the reasons stated above, the Court concludes that there was sufficient evidence to establish Ferriero's convictions under Counts One, Three, and Five. Accordingly, the Court has not identified any miscarriage of justice warranting a new trial.

## VI.    CONCLUSION

Based on the foregoing reasons, the Court DENIES Ferriero's motions for acquittal and a new trial pursuant to Federal Rules of Criminal Procedure 29(a), 29(c), and 33.  (D.E. Nos. 107, 138).  An appropriate Order shall accompany this Opinion.

_s/Esther Salas_____
**Esther Salas, U.S.D.J.**